**L T V AEROSPACE CORPORATION**

v.

**The UNITED STATES.**

**No. 342–68.**

United States Court of Claims.

May 15, 1970.

Marshall J. Doke, Jr., Dallas, Tex., for plaintiff. Morris Harrell, Dallas, Tex., attorney of record. Rain, Harrell & Emery, Dallas, Tex., of counsel.

Michael J. Rubin, Washington, D. C., with whom was Asst. Atty. Gen. William J. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, · SKELTON, and NICHOLS, Judges.

NICHOLS, Judge.

This is a suit by a contractor to recover certain costs disallowed by the Government during the performance of a cost-plus-a-fixed-fee (CPFF) contract. The Armed Services Board of Contract Appeals (hereinafter ASBCA or Board) denied the contractor's claim and for the reasons given below, we concur in the result.

· The pertinent facts are as summarized: On July 17, 1961, defendant awarded the Chance Vought Corporation (CVC) CPFF contract number NOw 62–0078–c (later changed to NOw 62–0378–c and hereinafter referred to as the "Contract") to reconfigure a Model F8U-1 aircraft into a prototype F8U–1T advanced jet trainer. On August 16, 1961, however, CVC, pursuant to a prior agreement, sold and transferred all of its assets and properties, including the Contract, to Ling-Temco Electronics, Inc., subsequently known as Ling-Temco-Vought, Inc. (LTV). Thereafter followed a series of intra-corporate transfers which also included the instant Contract. Seeking to protect its interest,

defendant consented to each assignment and re-assignment of the Contract on signature of a novation agreement, whose paragraph 7 bears heavily on this case. Paragraph 7, which may be hereinafter referred to as the "novation agreement" or simply the "novation", reads as follows:

7. The Transferor * * * and the Transferee hereby agree that the Government shall not be obligated to pay or reimburse any of them for, or otherwise give effect to, any costs, taxes or other expenses, or any increases therein, directly or indirectly arising out of or resulting from (i) said assignments, conveyances, and transfers, or (ii) this Agreement, other than those which the Government, in the absence of said assignments, conveyances and transfers, or this Agreement, would have been obligated to pay or reimburse under the terms of the Contracts.

■ Following the original merger date with CVC, plaintiff reevaluated the depreciable fixed assets of its predecessor, fixing them at $24,980,805, as compared to CVC's book valuation of $9,-733,321. This was necessary, plaintiff says, to reflect their new cost basis since the assets were purchased at their fair market value. In allocating depreciation costs to the Contract for the last four months of 1961 and for all of calendar year 1962, plaintiff submitted figures based on this re-evaluation, but $30,889 of plaintiff's depreciation costs—the difference between depreciation cost allocation based on CVC's book values and plaintiff's re-evaluation figures—was disallowed by the Director, Defense Contract Audit Agency. Plaintiff filed an appeal to the ASBCA under the disputes clause to recover the alleged reimbursable costs. Basing its decision on an earlier interpretation of an essentially similar novation agreement, the Board denied plaintiff's claim. LTV Aerospace Corp., ASBCA No. 11161, 67-2 BCA ¶6406 (1967). Plaintiff here seeks judicial review of that decision under sec-

tions 1 and 2 of the Wunderlich Act, 68 Stat. 81, 41 U.S.C. §§ 321, 322 (1964). Although the Board had the authority to construe the novation agreement, in course of adjudicating the claim, we are not bound to accept its interpretation as final. Such an exercise constitutes a question of law, determinable by this court *de novo*. Sundstrand Turbo v. United States, 389 F.2d 406, 411, 182 Ct.Cl. 31, 40 (1968).

Generally framed, plaintiff's arguments are these: First, the novation agreement, specifically the "any costs" language, is ambiguous and therefore should be construed unfavorably to its drafter—the Government. Plaintiff asserts that the only valid approach is to interpret "any costs" as being synonymous with "total cost". Reasoning from this premise, plaintiff argues that it should be permitted to prove that its total cost, which will be further defined *infra*, was not in excess of the total cost which CVC would have incurred had it gone on to complete the Contract. Second, plaintiff submits, alternatively, that at the very least, it should be allowed to offset against depreciation cost increases certain identifiable cost decreases (savings) which arose wholly because of the merger. We are not persuaded by these arguments.

I.

■ Reviewing the arguments in the order given above, we notice that the Board rejected plaintiff's "total cost" interpretation in view of its earlier *Sundstrand Turbo* decision. ASBCA No. 9112, 65-1 BCA ¶4653 (1965). There the Board was faced with a case whose factual circumstances are almost interchangeable with ours. Plaintiff Sundstrand Turbo, a successor in interest to the Atlas Machine and Foundry Company (AMF), was authorized to perform a CPFF contract which had been awarded previously to AMF. As a prerequisite to this authorization, however, Sundstrand was required by the Government to sign a novation agreement, nearly

identical to ours now in issue. Sundstrand commenced performance of the contract, but it was terminated for convenience upon the Government's decision to use a different propellant system. Negotiations followed during which a fee and reimbursable costs were to be fixed. Sundstrand raised no quarrel as to the fee determined, but it did take issue with the Government's allotment of reimbursable costs. It seems that Sundstrand had purchased all of AMF's fixed assets at the price of $1,000,000. On its then current books, however, AMF had valued these assets at $500,000. In allocating depreciation expenses to the contract, Sundstrand, like our plaintiff, submitted figures reflecting the upward re-evaluation of the assets. Since the Government would only allow depreciation allocation to the extent of AMF's valuation, Sundstrand appealed to the ASBCA for the difference. In denying relief, the Board said the following at p. 22,220:

> * * * The words "any costs" [in paragraph 7 of the novation agreement] are broad. They restrain the reimbursement of *particular costs on a selective basis,* where it appears that the cost increase arose out of the transfer. Moreover, it can hardly be doubted that the so-called "excess" depreciation and amortization arose out of the transfer of ownership of the Turbo Division. (Emphasis supplied.)

Since the present plaintiff's claim was decided by the Board prior to our review of *Sundstrand Turbo, supra,* it is necessary to appraise the Board's decision, founded primarily on its own *Sundstrand Turbo,* in the light of our affirmance of the latter. Plaintiff urges that our *Sundstrand Turbo* decision merely concurred in the Board's result without giving acceptance to its broad rationale. Sundstrand's counsel argued before us, and presumably before the Board, that the proscription of the novation agreement extended only to reimbursement for *costs of transfer* such as attorney's fees and possible premiums or bonuses

paid for the novated contract over and above its true value. *Costs of performance,* whatever the final figures, they said remained fully reimbursable. Apparently, Sundstrand's counsel raised no alternative argument before the Board, thus impliedly conceding that if the novation barred more than the transfer costs, Sundstrand had no claim. Implicit in our plaintiff's argument is that the Board's *Sundstrand Turbo* language exceeded the confines of counsel's narrowly cast issue. Not only did it hold that the words "any costs" "restrained reimbursement * * * where it appears that the cost increases arose out of the transfer", words later clarified so as to vitiate Sundstrand's costs of performance v. costs of transfer distinction, but it further stated, that the "reimbursement of *particular* costs [could be restrained] on a *selective basis.*" Plaintiff contends that although we quoted this "particular costs on a selective basis" language in our *Sundstrand Turbo* opinion, we nevertheless did not *adopt* it in affirming the Board. Combining this insight with our comments concerning the frailty of Sundstrand's record evidence, plaintiff concludes that we left the door ajar to admit its "total cost" theory.

In its brief and oral argument, plaintiff delineated for us the bounds of our *Sundstrand Turbo* decision:

> * * * *Sundstrand* must be limited to holding that an increase in cost of performance (as distinguished from a cost of making the transfer) arising out of or attributable to the transfer or agreement is prohibited without the *Government* being required to prove that the "total cost" of performance was increased. (Emphasis supplied.)

Quick to occupy the apparent void created by its own interpretation of the case, plaintiff submits that where a *contractor* alleges an evidentiary record capable of proving that its predecessor's expected total cost was not exceeded, it should be given the opportunity to substantiate

its allegation, and if successful, should be reimbursed for its claimed costs.

Assuming without deciding that our *Sundstrand Turbo* holds no more than plaintiff says, we shall proceed to consider the validity of its thesis as *res integra*. Unlike its counterpart in *Sundstrand Turbo*, plaintiff freely admits that the novation agreement had reference to some costs of performance and that its depreciation increases were within this category. What plaintiff objects to vehemently, however, is the Board's declaration, founded on its *Sundstrand Turbo* reasoning, that "the [any costs] language used in the novation agreement *envisions a selective cost consideration and precludes a 'total cost' approach*". *LTV Aerospace Corp., supra*, at pp. 29, 683–684. (Emphasis supplied.) That the "any costs" language is the acme of ambiguity is plaintiff's initial premise. It contends that the word "costs", standing without a more descriptive or precise modifier than the word "any", is meaningless. Such a view, plaintiff submits, went uncontradicted by the sole Government witness who testified before the Board. Moving from this premise, it urges the application of the well-established principle of construction against the draftsman which somehow leads us inexorably to plaintiff's "total cost" interpretation and its accompanying cost comparison technique. It does not, however, prove or allege that it so read paragraph 7 when entering into it. It does not tell us, *e. g.*, how it construed the agreement in negotiating with the transferor the value of the contracts as intangible assets. In default of such evidence, that the paragraph is ambiguous does not establish that plaintiff's interpretation of it is right.

Plaintiff in applying paragraph 7 would prove, by marshalling all the facts and figures in its voluminous record, that its total cost would not have surpassed the total cost of its predecessor. Broken down, plaintiff's method of comparing total cost requires the following steps: First, plaintiff would offset all cost increases arising out of or attributable to the transfer (the enlarged depreciation being the only cost increase at issue) against all cost decreases (savings) arising out of or attributable to the transfer. To paraphrase plaintiff's oral argument explanation, this latter item would include not only those cost savings *specifically* related to the transfer, like the reduction of the Texas state unemployment taxation rate which will be discussed *infra,* but also those general savings which plaintiff suggests arise automatically at any time when two well-managed corporations combine their talents and resources. Having done this, plaintiff could show whether there was a net increase, to which paragraph 7 would apply, or a decrease, excluding paragraph 7 from any impact.

We find such an exercise fraught with so many variables that we cannot visualize the parties to paragraph 7, as reasonably contemplating anything of the sort. It was pointed out to us earlier by Sundstrand's counsel, with whom we agree, that:

\* \* \* \* \* \*

It does not appear reasonable to assume that the parties to the Novation Agreement would, with substantial performance still to be rendered in the future, attempt to predict the future costs of performance under a CPFF contract. This would indeed be necessary if the parties were to intelligently assess whether or not the continued performance by the transferee would increase *costs of performance* as the Board has held. Such an interpretation is illogical and in fact impossible as the existence of CPFF contracts bears witness. \* \* \*

A promise by \* \* \* [a contractor] that it would not increase the costs of performance of a CPFF contract or would not at least make claim for such increased costs of performance, would necessitate that \* \* \* [a contractor] first know what \* \*

[its predecessor's] costs of performance would have been had the transfer not taken place.  This belies the nature of a CPFF contract.  \* \* \*

As described in paragraph 3–404.1(b) of the Armed Services Procurement Regulations, in effect when the Contract was let:

> \* \* \* The cost-reimbursement type contract is suitable for use when the nature and complexity of the procurement is such that costs of performance cannot be estimated with reasonable accuracy.  \* \* \*

Despite the nominal simplicity of the total cost method it is clear one could not just project a total cost for transferor and compare it with transferee's actual cost because this would fail to deny effect to differences not due to the transfer.  In this context we notice that our plaintiff not only claims the power to predict CVC's *total* cost of performing the instant CPFF contract (which by ASPR definition *supra* was incapable of close cost estimate), but even more questionable is its casual assumption of the prescience necessary to perform *individual* cost offset refinements.  Admittedly, plaintiff, with precision, could offset against the depreciation cost increases certain identifiable cost savings, e. g., state unemployment taxation rate reductions, brought about only because of the transfer.  Confounding plaintiff's scheme beyond redemption, however, is its insistence on offsetting measurable cost increases, like the one in issue, against uncertain cost savings as well. Perhaps plaintiff because of its greater resources was able to employ in performing this Contract a greater amount of efficiency (with corresponding cost savings) than CVC, but just how much is speculative at best.  Moreover, it might often happen that there would be differences in the accounting methods of predecessor and successor corporations requiring adjustments beyond merely projecting, to the future, predecessor's experience up to the transfer date.  It seems clear, therefore, that if the parties agreed to the total cost approach they agreed to a subjective adjustment in allowable cost with a wide penumbra of uncertainty.

Sundstrand's counsel also well remarked that:

> \* \* \* \* \* ..
> \* \* \* in order for  \* \* \*  [the Government] to "police" an agreement to no additional *performance costs*, constant subjective judgments would have to be made weighing at every turn \* \* \* [the contractor's] actual incurred costs against the probable costs which \* \* \* [its predecessor] might have incurred.  This would be a wholly impossible venture, and it is unreasonable to suppose that \* \* \* [the contractor] would have agreed to such conjecture or that \* \* \* [the Government] intended to attempt such a project.
>
> \* \* \* \* \* \*

Moreover, we observe that the result of a contractor not agreeing with Government conjecture would be burdensome and prolonged disputes which contractors, especially those marriage-minded conglomerates most likely to find themselves in these novated contract cost disputes, would find an obstacle to any prompt ascertainment of the financial results of Government work.  After all that has been stated we cannot believe that paragraph 7 of the novation agreement was intended by either party to engender such complexities.

Hence, assuming *arguendo* that the words "any costs" are ambiguous, we are unable to construe them as plaintiff proposes because plaintiff's construction is not one a reasonable contractor would have supposed to be correct, antecedently considered.

Thus our *Sundstrand Turbo* decision ruled out the costs of transfer v. costs of performance distinction, and presently we have exposed the invalidity of the "total cost" interpretation.  Remaining lastly, barring future legal inventive-

ness, is the latent "selective costs" problem allegedly created by the Board's *Sundstrand Turbo* and reaffirmed by the Board's decision of the instant claim. Both Sundstrand's and plaintiff's counsel predicted that a selective cost reading of the novation would rain all kinds of oppressive havoc on future contractors while bringing only windfalls to the Government. Both counsel, not wholly unpersuasively, argued that a strict application of the selective cost construction would require the impossible condition of perfect congruency between the bookkeeping systems, accounting procedures, overhead and indirect costs of Government contractors and their successors. Any mismatches, namely, any difference in the denomination, presentation or allocation of costs by the successor contractor, plaintiff argues, under the selective cost approach, would be viewed by Government auditors as a cost increase, thereby precluding reimbursement. Plaintiff herein devised for our consideration several horribles which if solved under the selective cost basis clearly illustrate, to plaintiff at least, the possible arbitrariness of the method. We respond to such presentations as we did in *Sundstrand Turbo:* Since we are not faced squarely with the problems posed by these hypotheticals, we think it improper to decide them or speculate as to their solutions. Placed before us presently is one single type of cost increase identical to that involved in *Sundstrand Turbo.*

## II.

Plaintiff's second argument seems to be so constructed as to allow recovery within the selective cost approach. If the Government is going to be accorded the right to selectively ferret out of a total cost picture those individual cost increases specifically and wholly attributable to the transfer, plaintiff claims the corresponding right to offset against such increases those individual cost decreases (savings) *specifically and wholly* attributable to the transfer. For example, plaintiff alleged that at the merger

date, CVC was paying Texas State Unemployment taxes at the maximum annual rate of 2.7%. (Termination of major Government projects caused CVC to order heavy layoffs in 1959 and 1960, thus explaining the high tax rate.) After CVC's operations were combined with plaintiff's, however, it did, as permitted by Texas law, assume plaintiff's lower taxation rate of 0.1%—the minimum rate in Texas. This substantial difference in rates, which plaintiff alleges, and we assume, was possible *only* because of the transfer, resulted in a tax savings to plaintiff in the amount of $868,247 in 1962, $755,524 in 1963, and $424,174 in 1964. Naturally these savings would operate to reduce the tax cost allocated to the Contract. Plaintiff also presented evidence of savings in franchise taxes which it alleges were attributable only to the transfer and which would undoubtedly have a reducing effect on tax costs allocated to the Contract.

The Board found, and the defendant agrees, "that these alleged 'savings' are not cognizable as costs under the contract because they were never incurred as expenses to the appellant [plaintiff]." Therefore it held there could be no offset.

■ We concur with the Board in the disposition of this issue, but we make no comment as to its supporting rationale. We decide this issue on the basis of the prefatory language of the novation which reads as follows:

> The Transferor * * * and the Transferee hereby agree that the Government shall not be obligated to pay or reimburse any of them for, *or otherwise give effect to, any costs * * * or any increases therein, * * *.* (Emphasis supplied.)

Despite plaintiff's persuasive appeal for equitable treatment, we believe that by allowing it to offset individual cost savings against individual cost increases, we would be forcing the Government "to otherwise give effect to" cost increases

in direct contravention of the novation signed by the parties.

Plaintiff, at oral argument, invited our attention to our recent Cutler-Hammer, Inc. v. United States decision, 416 F.2d 1306, 189 Ct.Cl. 76 (1969), which it says supports its position. In *Cutler-Hammer* we allowed plaintiff to offset cost overstatements against cost understatements of figures submitted in the negotiation of a Fixed Price Incentive Fee contract. For reasons made obvious in the opinion, however, the offset would only operate to the extent of expunging the overstatements. We find *Cutler-Hammer* inapposite to our case mainly because, unlike the novation agreement, the "Price Reduction for Defective Cost or Pricing Data" provisions governing *Cutler-Hammer* revealed no positive language to preclude offsets at least to the extent we allowed.

That case construed the "Truth in Negotiating" Act, 10 U.S.C. § 2306(f), (Supp. IV, 1965–1968), and the clause therein required for Fixed Price Incentive Fee contracts. Such contracts establish a target price on the basis of estimated costs, with price incentives and disincentives in case there are savings or excesses in cost below or above the estimates. The Congress believed that contractors had been obtaining illegitimate incentive rewards by submitting in negotiation inaccurate and excessive estimates. The statutory remedy was to require a price reduction to the extent a target price had been enhanced by such means. We thought the legislative concern was primarily directed at price, and if excessive cost estimates were offset by insufficient ones, an illegitimate price increase would not have occurred and a reduction in the price would be merely penal. The present case concerns a different type of contract and contract language, used for entirely distinct purposes.

Defendant's motion for summary judgment is allowed; plaintiff's motion for summary judgment is denied, and the petition is dismissed.

COWEN, Chief Judge, and COLLINS and SKELTON, Judges, dissent from the foregoing opinion of court.