**DALE INGRAM, INC., (formerly Florida Builders, Inc.)**

v.

**The UNITED STATES.**

No. 412–65.

United States Court of Claims.

Decided March 16, 1973.

Peter Latham, Washington, D. C., for plaintiff; I. H. Wachtel, Washington, D. C., of record; Glade F. Flake, Washington, D. C., of counsel.

Paul A. Zoss, U. S. Dept. of Justice, Court of Claims Section, Civil Division, with whom was Asst. Atty. Gen., Harlington Wood, Jr., for defendant; Michael B. Rosenberg, Washington, D. C., of counsel.

Before .COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges.

ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

SKELTON, Judge, delivered the opinion of the court:

In this case the plaintiff, Dale Ingram, Inc. (formerly Florida Builders, Inc.), contends that two decisions of the Armed Services Board of Contract Appeals (the Board), one on liability and

one on quantum, are erroneous as a matter of law and are not supported by substantial evidence. The plaintiff also seeks reformation of the contract on the ground of mistake.

The contract in question was one for Capehart housing construction upon land in Florida that had been under water and had to be filled in before the housing could be constructed. The land fill was to be accomplished by a different contractor under a different contract (land fill contract) which originally required compacting the land to a maximum density of 95 percent. However, this compaction requirement was reduced to 90 percent before the land fill contract was awarded on April 18, 1960, to Gahagan Dredging Corporation (Gahagan). The compaction requirement was changed again on the date the land fill contract was awarded to eliminate the numerical requirement of 90 percent of maximum density to:

"All embankments and fill shall be dense and uniform."

In the meantime, plaintiff prepared and submitted a bid on the contract in issue before us (the construction contract) which required the construction of 500 houses on the area to be filled in. The Invitation For Bids (IFB) stated that the houses were to be constructed on land to be filled in by another contractor and all bidders were admonished to visit the site and become familiar with the type and quantity of earthwork required in the construction contract. They were further informed that the specifications and drawings of the land fill contract were available for inspection at two different offices, the names and addresses of which were stated. The plaintiff visited the site and worked with a contractor who intended to bid on the land fill contract. By reason of these facts, the plaintiff had knowledge of the basic specifications of the land fill contract, including the original requirement that the fill would be compacted to 95 percent density and the addendum changing this requirement to

90 percent density. The plaintiff submitted its bid on the construction contract, but all bids were rejected because they exceeded the money available.

Thereafter, during July and August 1960, a second IFB was issued. The plaintiff's representatives visited the site again and observed the land fill operations of Gahagan. The plaintiff desired to bid on the construction contract again, which contract provided in its specifications that:

\* \* \* [T]he top six inches of material on which footings and floor slabs are placed shall have a density of not less than 90 per cent of laboratory density.

Being mindful of the foregoing requirement of 90 percent density for the top six inches of the soil for the footings and floor slabs, the plaintiff sought and obtained a quotation of $277,000 from Redland Construction Company, Inc. (Redland), a subcontractor, to do the grading and footing compaction work at the site under the construction contract. Redland inspected the condition of the soil at the site and then raised its quotation to $410,000. The plaintiff then got a higher quotation from another subcontractor, after which it negotiated a contract with Redland to do the work for $403,000. The plaintiff and Redland then bid on the contract without knowing that the specifications of the land fill contract had been changed so that the requirement for compaction to 90 percent maximum density had been removed and the words "dense and uniform" had been substituted therefor. At the time they bid, the plaintiff and Redland thought that the 90 percent density requirement was still in the land fill contract.

It should be noted that the plaintiff did not ask for up-to-date land fill specifications during the July-August bidding period and did not make any investigation with reference to same. There is no evidence that the government knowingly or willfully withheld any of such information from the plaintiff.

The plaintiff had plenty of time to investigate the compaction requirements of the land fill contract as it was awarded on April 18, 1960, and the construction contract was awarded to the plaintiff eight months later on December 19, 1960, as stated below.

After the bids were opened on the construction contract, but before the contract was awarded, plaintiff learned that the 90 percent compaction requirement of the land fill contract had been changed to "dense and uniform." The plaintiff protested to the government but did not ask to be allowed to withdraw its bid. The government refused to agree that the fill was other than what should have been anticipated. The plaintiff, being the low bidder, was awarded the contract and signed the agreement, reserving the right to present a claim for changed conditions. The contract was effective December 19, 1960, and was for $8,171,300.

The contract contained the standard changes and changed conditions and disputes clauses.

The plaintiff began work in January 1961, but did not start the compaction of the footings involved in this case until about March 15, 1961. Redland, the subcontractor, attempted to achieve the 90 percent density for the footings and floor slabs, as required by the contract, but encountered difficulty due to the type and condition of the soil. Various tamping machines were tried, but 90 percent density was found not to be possible. Finally, on April 24, 1961, the size of the footings was changed and the required compaction was reduced from 90 percent density to 80 percent laboratory density. After these changes were made in the contract, Redland was able to achieve 80 percent compaction. However, 30 days were wasted in trying to achieve the 90 percent density.

However, the plaintiff encountered difficulty in achieving even the 80 percent density compaction. This was due to a variety of factors, including the nature of the material, the difficulty in crushing the pieces of oolite encountered by the machines which had to be small enough to go into the trenches, and the caving-in of the walls of the trenches. Excessive concrete was required to fill in the caved-in walls of the trenches, as well as for the building of continuous pads similar to a runway instead of a separate pad for each house. The continuous pads were built so as to allow the use of heavier equipment for compaction and to obtain better compaction at the bottom of the footing elevations.

The plaintiff filed a claim under the changes and changed conditions clauses for an equitable adjustment, contending that physical conditions at the site of the construction contract differed materially from those anticipated. From an adverse ruling, it appealed the claim to the Armed Services Board of Contract Appeals (the Board). The case was docketed Florida Builders, Inc., ASBCA No. 8944.[1]

After an extensive hearing, the Board handed down its decision on December 17, 1969. In its opinion the Board stated:

> The primary question presented in this appeal is whether the fill at Sigsbee Park was in the condition stated in the contract. This includes the plans and specifications for the Gahagan [land fill] contract, as they were modified by Amendment No. 1 [the "dense and uniform" change] thereto.

The plaintiff contended before the Board that the fill was neither "dense" nor "uniform." Considerable expert testimony was introduced by both parties as to the meaning of the term "dense" as required by the specifications and as used in the trade and industry. The plaintiff's expert contended it meant 90 percent maximum density. The Board found, however, that defendant's expert testimony was more persuasive to the effect that the terms "dense" and "uniform" are not terms of art in either soil mechanics or the construction industry

---

1. The contract was No. NBy(CH)–29105.

to the extent that they may be assigned specific numerical factors for gradation and density. This testimony further showed that in order to determine what the plaintiff should have encountered at the site, many factors would have to be considered, such as the nature of the oolitic limestone and its manner of placement by hydraulic pipeline dredge, the reworking of the material after its ejection from the pipeline, and the crushing of the material with bulldozers. Based on this evidence, some of which was admittedly conflicting, the Board held that the fill was as uniform as could be expected, and that the plaintiff could reasonably have expected the fill to be above 80 percent, but less than 90 percent, of laboratory density. The Board stated further that the plaintiff should have expected some compaction effort on his part to bring the material to 90 percent density under its contract even if the land fill contract had required 90 percent density compaction as plaintiff believed when it submitted its bid. The Board found that the material was generally below 80 percent, while plaintiff should have anticipated between 80 and 90 percent density. Consequently, when the requirement in plaintiff's contract was reduced from 90 to 80 percent density on April 24, 1961, plaintiff was required to increase the density only a small percent to reach the 80 percent density, and this was no more than it should have anticipated in preparing its bid. The plaintiff's contract required it to do some compaction, otherwise the compaction provision would have been meaningless.

After April 24, 1961, when the compaction requirement was reduced to 80 percent density, the plaintiff was able to achieve it without much difficulty. However, the Board found that the plaintiff had been delayed 30 days trying to obtain 90 percent density and concluded that it should be paid for the costs directly attributable to this delay, including interest on its loan for such period of 30 days and its direct costs in attempting to perform the impossible requirements. The Board, by agreement of the parties, considered entitlement only. It sustained the appeal and remanded the case to the parties for negotiation of an equitable adjustment of the contract price.

The parties could not agree on an equitable adjustment and the plaintiff appealed to the Board again on the issue of quantum. This appeal was docketed as Florida Builders, Inc., ASBCA No. 8944. A comprehensive hearing was had before the Board on every item of cost claimed by the plaintiff under the Board's previous decision on entitlement, including extra compaction effort, the 30 day delay and the increase in expenses in placing footings for the houses, and additional costs in placing the pads for the slab-on-grade houses. At this hearing, the parties stipulated that the plaintiff was to receive $14,792 for the 30 days delay. They also stipulated that the plaintiff was to receive $3,170 for the extra compaction effort. They further stipulated to prices of $15.50 per cubic yard of concrete and $3.00 per cubic yard for labor. The Board found that the plaintiff was due the following costs for extra concrete:

| | |
|---|---|
| Actual Concrete Placed ...... | 14,814.00 cu. yds. |
| Estimated (size of footings + 5% .............. | 13,433.34 cu. yds. |
| Difference ........... | 1,380.66 cu. yds. |
| Cost per cu. yd. ............ | $18.50 |
| Total amount for concrete ......... | $25,542.21 |

The Board also allowed plaintiff extra compensation for extra fill placed at the pad locations, and an additional amount for removing the excess pad material from between the buildings, as well as extra pay for work in attempting to gain additional subgrade compaction at the footing level. The amounts allowed for these extra expenses were as follows:

| | |
|---|---|
| Extra fill 12,500 cu. yds. × $1.80 = .. | $22,500.00 |
| Remove extra fill 12,500 cu. yds. × $.40 = ......... | 5,000.00 |
| Extra compaction 25,000 cu. yds. × $.20 = ........ | 5,000.00 |
| Subtotal .................... | $32,500.00 |
| Prime contractor overhead at 10% = .. | 3,250.00 |
| Total due to pads ........... | $35,750.00 |

The total overall extra costs allowed plaintiff by the Board as a result of changed conditions, in the total sum of $84,009.46, which includes the above costs, were as follows:

## DECISION—CHANGED CONDITIONS

We have found the following amounts:

| | |
|---|---|
| Extra cost of trenching | $ 3,170.00 |
| Costs due to delay | 14,792.00 |
| Extra concrete | 25,542.21 |
| Extra compaction (Redland) | 35,750.00 |
| Total cost | $79,254.21 |
| Profit at 6% | 4,755.25 |
| Total | $84,009.46 |

In the meantime there was another appeal to the Board by plaintiff growing out of this contract that involved a dispute growing out of the rejection by the contracting officer of certain Hotpoint ranges furnished by the plaintiff for the houses. That appeal was docketed under ASBCA No. 9013, and was settled by a stipulation of the parties to the effect that the plaintiff was to receive an additional $8,588. That appeal is mentioned here because the Board described it in its opinion in Docket No. 8944, and added the $8,588 to the $84,009.46 equitable adjustment described above, making the total equitable adjustment due the plaintiff on this contract the sum of $92,597.-46.

The above amount of $92,597.46 awarded to the plaintiff by the Board has not been paid by the government because it claims an off-set as follows. In another proceeding, not related to the case before us, involving a different contract (contract No. DA08–123–ENG–2830) between the plaintiff and the government, the contracting officer issued an order on December 1, 1966, that the plaintiff was indebted to the government in the sum of $429,291.84. The plaintiff appealed that decision to the ASBCA and it has been docketed as ASBCA No. 12152. A stipulation was entered into in that case that the sum at issue is $495,429.04, plus interest. A hearing was held from September 25 through 27,

1972. No decision has been reached by the Board. The government contends in the case before us that the contracting officer's decision in No. 12152 is final until and unless it is overturned by the Board and that it is entitled to wait the outcome of that case before paying the plaintiff the $92,597.46 awarded in the present case, because it claims the right of off-set. The plaintiff, on the other hand, argues and claims that the failure of the government to pay the $92,597.46 is a breach of contract for which it is entitled to judgment plus interest. This is one of the plaintiff's claims in the present case, as will be shown below.

The plaintiff was not satisfied with the Board's decision on quantum in the present case in which plaintiff was awarded the $92,597.46 mentioned above. It filed this suit seeking to increase the award and asking for other remedies as well, as will be described, *infra*.

The case is before us on plaintiff's motion for partial summary judgment and defendant's cross motion for summary judgment.

It is difficult to come to grips with plaintiff's claims in the case before us, because its contentions embrace almost the whole field of public contract law, including equitable adjustment, changes and changed conditions, substantial evidence, defective specifications, ambiguous contract provisions, mistaken bid, reformation, errors of law, and breach of contract, to name a few. This more or less "shotgun approach" has presented us with the arduous task of trying to separate the main issues from the forest of claims so that they may be analyzed and considered.

The plaintiff first claims that the award of the $84,009.46 by the Board is not supported by substantial evidence and that the case should be returned to the Board to determine the equitable adjustment due plaintiff for "additional sums" paid to Redland, its overhead, plus costs of compaction after April 24, 1961, together with a reasonable profit on both sums, the total amount of which

amounts to $247,870.72, which does not include the $84,009.46 already awarded by the Board.

In the alternative, plaintiff contends that the contract should be reformed on the ground of mistake. When reformed, the plaintiff says, the contract should contain (1) an express promise by defendant that the construction site when made available to the plaintiff would contain fill compacted to 90 percent of maximum density, and (2) an increase in the contract price of $134,895.60, the same being the minimum amount by which the plaintiff was mistaken. It asks this court to enter judgment for $97,000.60 plus the $37,895 already awarded by the Board for Redland's compaction effort (a total of $134,895.-60). When this is done, the plaintiff asks the court to suspend proceedings so that it can return to the Board to prove it is entitled to an equitable adjustment in the amount of $196,984.58, which sum represents the costs of achieving compaction after the requirement was reduced to 80 percent density on April 24, 1961.

Finally, the plaintiff seeks recovery of the $92,597.46 previously awarded by the Board which it says the defendant has wrongfully withheld in breach of its contract, plus interest at six percent from July 23, 1971. The plaintiff also asks the court to stay proceedings before the Board in No. 12152 "so that the merits of defendant's claim may receive de novo trial in this court."

I

*The Change and Changed Condition Claim*

The main thrust of the plaintiff's claim that its equitable adjustment for a changed condition should be increased above the $84,009.46 awarded by the Board is based on (1) its contention that it would have paid Redland $126,000 less for the grading and compacting work if plaintiff and Redland had known that compaction had been changed from 90 percent density to "dense and uniform" in the land fill contract, and to this amount must be added 10 percent for overhead and six percent for profit, making the total amount $134,895.60; and (2) alleged extra effort to achieve 80 percent density after April 24, 1961.

The Board found that there was no proof that plaintiff could have obtained Redland's contract for $126,000 less if they had known of the change in the land fill contract. In fact, the Board found the evidence to be against the plaintiff on this claim. The facts found by the Board showed that Redland quoted a price of $277,000 to the plaintiff and after inspecting the material at the site, it raised its quotation to $410,000. The plaintiff then got a quotation from another subcontractor, but it was higher than Redland's. Then plaintiff and Redland negotiated a price of $403,000 and they then bid on that basis. The plaintiff has arrived at the $126,000 figure by subtracting the original Redland quotation of $277,000 from its final negotiated quotation of $403,000. The proof nowhere shows that Redland would have done the work for its original quotation of $277,000 if it had known of the change in the land fill contract. The Board found that the reason for the change in the quotation by Redland was that its original quotation was too low. This is buttressed by the fact that the Board found that the government's Design Director, Southern Division, Naval Facilities Engineering Command, prepared an estimate of the value of Redland's work, using 1960 and 1961 prices current with performance, which far exceeded Redland's original quotation and approached the actual subcontract price of $403,000.

In any event, the Board considered every item of extra cost incurred by Redland in trying to achieve compaction of 90 percent density prior to April 24, 1961, and made its award accordingly. Furthermore, the Board stated that the parties had stipulated that plaintiff was to receive $14,792 for the 30 days

delay in trying to achieve the 90 percent density, and they also stipulated that:

* * * [T]he appellant [plaintiff] is to receive $3,170 *for the extra compaction effort.* * * * [Emphasis supplied.] [71–2 BCA ¶ 8992.]

The parties also stipulated before the Board to prices of $15.50 per cubic yard for concrete and $3.00 per cubic yard for labor in arriving at the amount due the plaintiff for extra concrete. The plaintiff is bound by these stipulations. The amounts specified in the stipulations were included in the costs awarded by the Board as itemized, *supra.* It appears that the evidence shows that plaintiff has been compensated for the extra compaction effort and other extra work in accordance with the stipulations and facts proved before the Board. We hold that the decision of the Board relative to these extra costs was neither arbitrary nor capricious and was supported by substantial evidence. Accordingly, the decision of the Board must be accorded finality inasmuch as this case is before us for review under the standards of the Wunderlich Act, 41 U.S.C. §§ 321, 322 (1970), Morrison-Knudsen Co. v. United States, 345 F.2d 833, 836–837, 170 Ct.Cl. 757, 761–763 (1965); Koppers Co. v. United States, 405 F.2d 554, 557, 186 Ct.Cl. 142, 147–151 (1968).

■ With respect to plaintiff's claim that it is entitled to more compensation for its "alleged extra effort" in trying to achieve 80 percent compaction density after April 24, 1961, the Board found that the plaintiff should have expected to receive the construction site compacted to as low as 80 percent density under the terms "dense and uniform" in the land fill contract. In this regard, it appears that the Board was more than generous in treating the situation as if the plaintiff had knowledge of the dense and uniform provisions of the land fill contract at the time it made its bid. The plain truth of the matter is that the plaintiff did not know about it and was clearly negligent in failing to have this knowledge. The evidence shows that the change in the land fill contract was made before the invitation for bids was issued for the construction contract and at least eight months before plaintiff was awarded the construction contract. Its failure to check the contents of the land fill contract during this long lapse of time before it submitted its bid was plain negligence. It may be, as defendant suggests, that this negligence bars the plaintiff from basing a claim on this change in the land fill contract. *See* Martin Lane Co. v. United States, 432 F.2d 1013, 193 Ct.Cl. 203 (1970).; Schoeffel v. United States, 193 Ct.Cl. 923, 935 (1971), and Albano Cleaners, Inc. v. United States, 455 F.2d 556, 197 Ct.Cl. 450 (1972). These cases hold that a contractor who submits his bid without reading all of specifications does so at his peril. It is our view that in such a case the contractor assumes the risk of complying with the specifications and cannot complain later on if he is required to perform the contract in accordance with such specifications, provided there is no misrepresentation or overreaching by the government. However, the Board held in effect that even if the plaintiff had known of the change when it submitted its bid, it could not recover for any effort made to achieve the 80 percent density after April 24, 1961. This decision was arrived at on the evidence submitted by both parties at the Board hearing as to the meaning of the terms "dense and uniform" in the trade and industry. There was very little problem as to whether the land fill was uniform as it had been distributed from a hydraulic pipeline dredge which resulted in its being put in place uniformly. The plaintiff's main contention was with reference to the meaning of the term "dense." The plaintiff's expert witness testified that the term required the material to be between 86 and 90 percent density. The defendant's expert witnesses testified that it could mean that the material could be as low as 80 percent density, but that it was difficult to assign a numerical classification to it because many factors had to be consid-

ered, such as the condition and type of material involved. The Board weighed this evidence and concluded that under the terms "dense and uniform" the plaintiff should have expected to receive the construction site compacted as low as 80 and as high as 90 percent density. While the interpretation of the meaning of the provisions of a contract is a question of law for the court, nevertheless the decision of the Board on a question of law is entitled to great weight if it is based on the Board's expertise and is not unreasonable. H. N. Bailey & Associates v. United States, 449 F.2d 376, 196 Ct.Cl. 166 (1971); Red Circle Corp. v. United States, 398 F.2d 836, 185 Ct. Cl. 1 (1968). Furthermore, it is well established that factual determinations that form the basis of the Board's contract interpretation are entitled to finality if supported by substantial evidence. D & L Construction Co. v. United States, 402 F.2d 990, 993, 185 Ct.Cl. 736, 743 (1968); Jamsar, Inc. v. United States, 442 F.2d 930, 932, 194 Ct.Cl. 819, 823 (1971). In this instance, we think the Board's decision was within the zone of reasonableness and was supported by substantial evidence and is entitled to finality.

■■ Plaintiff's contract required it to do some compacting work, otherwise the provisions therein that required it would have been meaningless. Under the factual findings of the Board, the plaintiff should have expected to receive the land fill to be compacted to 80 percent density after April 24, 1961, and if such compaction was slightly below 80 percent, its contract required it to bring the compaction up to 80 percent. It has been held that expenses which a contractor would have been required to expend anyway had no changed condition occurred are not recoverable as a part of an equitable adjustment. Roscoe - Ajax Constr. Co. v. United States, 458 F.2d 55, 198 Ct.Cl. 133 (1972); Paul Hardeman, Inc. v. United States, 406 F.2d 1357, 1362–1363, 186 Ct.Cl. 743, 751 (1969), and Kaiser Industries Corp. v. United States, 340 F.2d 322, 337, 169 Ct.Cl.

310, 335–336 (1965). In this case the plaintiff was not required to expend any more effort in reaching 80 percent density than it should have expected when it submitted its bid. The finding of the Board and its decision to this effect is supported by substantial evidence and is entitled to finality.

The facts before the Board showed, and the Board found, that after the compaction density requirement was lowered to 80 percent on April 24, 1961, the plaintiff was able to achieve such 80 percent density without much difficulty. The Board was correct in holding that the plaintiff was not entitled to any extra compensation in achieving 80 percent density after April 24, 1961, because that was an obligation the contract required it to perform.

■■ The plaintiff also argues that the term "dense" in the land fill contract was ambiguous and that the ambiguity should be resolved against the government who drafted the contract if the contractor's interpretation is reasonable. It urges that its interpretation of "dense" as meaning 90 percent density was reasonable. The fault that is self-evident in this argument is the fact that the plaintiff did not even know that the term "dense" was in the land fill contract when it submitted its bid and for that reason it could not and did not interpret the meaning of the term at that time. The plaintiff cannot now contend that it relied on any interpretation of this specification when it had no knowledge of its existence. It is well-established that where a contractor is relying on an interpretation of an alleged ambiguous contract, he must show that he relied on such interpretation. Brezina Constr. Co. v. United States, 449 F.2d 372, 196 Ct.Cl. 29 (1971); WPC Enterprises, Inc. v. United States, 323 F.2d 874, 876, 163 Ct.Cl. 1, 6 (1963); Martin Lane Co. v. United States, supra; LTV Aerospace Corp. v. United States, 425 F.2d 1237, 1240–1241, 192 Ct.Cl. 191, 197–198 (1970), and Randolph Eng'r Co. v. United States, 367 F. 2d 425, 429–431, 176 Ct.Cl. 872, 880–882

(1966). There was no such reliance by plaintiff here, and the rule that ambiguities are resolved against the drafter does not apply.

## II

### Reformation of the Contract

The plaintiff contends that the contract should be reformed because its bid was the result of a mistake in that it thought that the site would be compacted to 90 percent density by the land fill contractor, whereas, such contractor was only required to compact it so that it would be "dense and uniform." It says that because of this mistaken belief it submitted a bid on the construction contract which required it to compact the footings for the houses and slabs to 90 percent density.

■ In the first place, these contentions have already been placed before the Board by the plaintiff under the disputes clause of the contract as changed conditions which entitled it to an equitable adjustment. The Board considered the claim, held hearings, and settled the issues by awarding the plaintiff an equitable adjustment, as set forth above. The plaintiff cannot now relitigate the same claim and the same issues in this court under a reformation theory. United States v. Utah Constr. & Mining Co., 384 U.S. 394, 419–420, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966); Northbridge Electronics, Inc. v. United States, 444 F.2d 1124, 1127, 195 Ct.Cl. 453, 458 (1971), and Marley v. United States, 423 F.2d 324, 328–329, 191 Ct.Cl. 205, 213–214 (1970).

■ Actually, there was no mistake in the plaintiff's bid that would support a reformation of the contract, because plaintiff submitted exactly the bid that it intended to submit. The government did not know of any error in the bid, and in fact, there was none. There was no overreaching or deception on the part of the government. There was no misreading of the specifications by the plaintiff. In fact, the specifications it now complains of were not read at all,

notwithstanding the provisions in the invitation for bids that admonished the plaintiff to familiarize itself with such specifications.

The plaintiff cites Chris Berg, Inc. v. United States, 426 F.2d 314, 192 Ct.Cl. 176 (1970); Chernick v. United States, 372 F.2d 492, 178 Ct.Cl. 498 (1967), and Ruggiero v. United States, 420 F.2d 709, 190 Ct.Cl. 327 (1970) in support of its reformation claim. The court granted reformation in each of those cases, but they are clearly distinguishable on the facts from the instant case. In *Chris Berg* and *Chernick*, mistakes were made in the bids because of misplaced decimal points in the figures in the bid. In *Ruggiero*, the contractor failed to indicate that its bid was on a group of parcels instead of individual parcels. In each of those cases there was a pure clerical error by the contractor that the government either knew about or should have known about. In each of those cases the bids were not the bids that the contractor intended to make. None of those facts exist here. In our case, the plaintiff bid exactly what it intended to bid, and the government had no knowledge, and had no reason to suspect, that plaintiff did not know the requirements of the specifications. The case of Jamsar, Inc. v. United States, 442 F.2d 930, 194 Ct.Cl. 819 (1971), is in point. There the court said:

\* \* \* [T]he type of mistake upon which reformation may be granted must be a clear cut clerical or arithmetical error or a misreading of the specifications of such a serious and obvious nature that the defendant's contracting agents would (or should) know of the mistake. Ruggiero v. United States, 420 F.2d 709, 190 Ct.Cl. 327 (1970).

\* \* \* \* \* \*

\* \* \* "[A]n agreement cannot be revised to reflect a plaintiff's subjective understanding the defendant does not and should not know of." Benjamin v. United States, 348 F.2d 502, 172 Ct.Cl. 118 (1965). [*Id.* 442 F.2d at 935–936, 194 Ct.Cl. at 828–829.]

The plaintiff also cites the case of Rhode Island Tool Co. v. United States, 128 F.Supp. 417, 130 Ct.Cl. 698 (1955) in support of its reformation claim. We do not think that case helps the plaintiff. There the bidder made a clerical mistake in figuring the cost of items required by the contract. He figured the cost of stud bolts instead of the machine bolts required by the specifications. The error there was much like the errors in *Chernick, Chris Berg,* and *Ruggiero. See also,* Bromion, Inc. v. United States, 411 F.2d 1020, 188 Ct.Cl. 31 (1969), and in addition, the contractor had sought to withdraw its bid before a binding award was made.

 If there was any mistake in the bidding in the instant case, it was a unilateral mistake on the part of the plaintiff. This court has held that reformation will not be awarded on the unilateral mistake of one of the parties to a contract. Natus Corp. v. United States, 371 F.2d 450, 458, 178 Ct.Cl. 1, 14 (1967); Olin Mathieson Chemical Corp. v. United States, 179 Ct.Cl. 368, 408 (1967); Allied Contractors, Inc. v. United States, 310 F.2d 945, 159 Ct.Cl. 548 (1962); California-Pacific Utilities Co. v. United States, 194 Ct.Cl. 703, 717–719 (1971), and Albano Cleaners, Inc. v. United States, *supra.*

 Finally, plaintiff argues that the contract should be reformed because of the provisions of ASPR 2.406–3 which authorizes the contracting officer to correct mistakes in bids where such mistakes are discovered after the bid is opened but before the award of the contract. The plaintiff says that such is the situation in this case and the regulation requires that the contract be reformed. The trouble with this argument is that ASPR 2.406–3 did not become effective until December 31, 1960, when it was first published in 25 FR 14118. The effective date of the contract in the instant case was December 19, 1960. Consequently, ASPR 2.406–3 does not apply to this case.

It appears that prior to the publication of ASPR 2.406–3, the rule governing the problem before us was set forth in Massman Constr. Co. v. United States, 60 F.Supp. 635, 643, 102 Ct.Cl. 699, 717, cert. denied, 325 U.S. 866, 65 S.Ct. 1403, 89 L.Ed. 1985 (1945) as follows:

> At the time the contract was awarded to the plaintiff, pursuant to its bid, and at the time it signed the contract, the plaintiff was not mistaken. It had become aware of the mistake in its bid, and faced the problem of whether it was willing to sign a contract for the figure which it had, by mistake since discovered, bid. The Government was also aware of the plaintiff's claim that it had made a mistake in its bid. There was not, then, at the time of signing the contract, any lack of knowledge, either mutual or unilateral, which caused either of them to make the contract which they did make, when in fact they intended to make a different contract. That being so, if we should reform the contract as the plaintiff requests, we would be making for the parties the very contract which one of them, the Government, expressly refused to make at that time, though requested to do so by the plaintiff.

*See also* Board of Trustees, etc. v. O. D. Wilson Co., 77 U.S.App.D.C. 127, 133 F.2d 399 (1943); Early & Daniel Co. v. United States, 271 U.S. 140, 46 S.Ct. 457, 70 L.Ed. 874 (1926); aff'g, 59 Ct.Cl. 932 (1924); Willard, Sutherland & Co. v. United States, 262 U.S. 489, 43 S.Ct. 592, 67 L.Ed. 1086 (1923), aff'g 56 Ct.Cl. 413 (1921).

The plaintiff is clearly not entitled to reformation of the contract under the rule announced in the *Massman Construction Co.* case, as well as for other reasons set forth above for denying such reformation.

Mention should be made of the fact that after plaintiff submitted its bid but before the award of the contract, the plaintiff learned of the change in the

specifications of the land fill contract and complained to the contracting officer. However, the plaintiff neither requested nor demanded the right to withdraw its bid. On the other hand, it proceeded to sign the contract with full knowledge of the facts, although it did reserve the right to file a claim for an equitable adjustment under the changed condition and disputes clauses. It could be argued that this conduct constituted a waiver of the claim that is being made here. *See* Adler Constr. Co. v. United States, 423 F.2d 1362, 1366, 191 Ct.Cl. 607, 611 (1970). However, we do not need to decide that question. Suffice it to say the plaintiff would have been in a much stronger position if it had asked permission to withdraw its bid and such request had been refused by the contracting officer, but we do not mean to indicate that even if this had occurred the plaintiff would be entitled to reformation of the contract.

### III

### *The Breach of Contract Claim*

■ The plaintiff contends that by withholding the $92,597.46 that has been awarded to it in this case by the Board, the government has breached its contract and plaintiff demands the payment to it of this amount plus interest from July 23, 1971, at six percent. This claim would appear to be inconsistent with the claims previously discussed wherein the plaintiff contends that the $92,597.46 is not enough and it seeks more under the changed conditions clause, as well as under its reformation claim. In any event, the breach of contract claim must be rejected because the government has a right of off-set with respect to the decision of the contracting officer in Appeal No. 12152 now pending before the Board in which he held that the plaintiff is indebted to the government in the sum of $429,291.84. The decision of the contracting officer in this regard is final and binding until and unless it is reversed or changed by the Board or by this court should the case be appealed here from the Board. Consequently, the government has the right to withhold the $92,597.46 awarded to the plaintiff in this case until Appeal No. 12152 has been finally decided.

■ The plaintiff has asked this court to stay the proceedings in Appeal No. 12152 now pending before the Board. That case is not before us and we have no authority to grant such a stay.

### IV

### *Conclusion*

We hold that the decision of the Board on all the issues was neither arbitrary nor capricious, and is supported by substantial evidence and is correct as a matter of law, and the same is accorded finality and is affirmed; that the claims of the plaintiff for an additional recovery under the changed conditions clause of the contract and for reformation of the contract, as well as its claims for breach of contract, and for stay of proceedings of Appeal No. 12152 now pending before the Board, and for remand to the Board, are denied.

Accordingly, the plaintiff's motion for partial summary judgment is denied, except that judgment is awarded to the plaintiff for the sum of $92,597.46, subject to the right of the government to set-off its claim, if any, against the plaintiff in Appeal No. 12152 now pending before the Board, at the time the appeal in that case is finally disposed of by the Board or by this court if the case reaches us on appeal. The defendant's motion for summary judgment is granted as to all other claims and issues involved in this case, and the plaintiff's petition is dismissed with respect to them.