BAKER, JUDGE:
Claimant contractor entered into an agreement with respondent, designated as project no. 1-6404 (72)123, on November 25, 1985, for the construction of the Glade Creek bridge, identified as bridge no. 3382. Claimant had substantially underbid other competitors for the project, which entailed the construction of a four-lane 2,180 foot long, bridge in Raleigh County. The $28,876,876.00 bridge has two main piers, and two intermediate piers, connecting to abutments. Claimant alleges that it encountered unexpectedly hard rock in building two of the piers, designated as pier 2 and pier 3. The foundations for piers 2 and 3 were drilled caissons, which were constructed by Meredith Drilling Company, Inc., and Permian Rat Hole Drilling, a joint venture which was a subcontractor of claimant. During the drilling of the caissons for both piers 2 and 3, claimant alleges the density of the rock base its subcontractor encountered was two to four times greater than was identified by respondent's core drillings. Claimant contends the hard rock constitutes a changed condition of the contract, entitling claimant to equitable adjustment for the resulting cost and delay occasioned by additional labor, equipment, maintenance, and overhead necessary to complete the drillings. Claimant seeks to recover its own excess costs and those of its subcontractor, Meredith/Permian Rat Hole, in the aggregate amount of$2,054,823.02.
Claimant and respondent agree that the prebid core drillings for pier 2 indicated that the caissons were expected to be drilled in sedimentary rock described as sandstone, shale and siltstone with a range of rock harness varying from soft to hard. No very hard sandstone was indicated. Prebid core drillings for pier 3 did indicate hard to very hard sandstone in one of the five sample drillings. Based upon the representations of respondent's prebid drillings, claimant estimated its construction costs and submitted its bid. However, claimant alleges that when the drilling for pier 3 caissons was performed, claimant encountered vary hard sandstone of higher strength and abrasiveness than indicated by respondent's bid samples. Claimant also alleges that *113 greater quantities of this material were discovered than anticipated. Claimant's witnesses indicated their belief that the lost time and additional costs of pier 3 would be recovered and offset by pier 2 performance. Accordingly, with regard to pier 3 claimant provided no formal notice to respondent of a changed condition, nor were force account records maintained.
However, when pier 2 caissons were drilled, very hard sandstone was again found and again obstructed and impaired claimant's performance on the project. Respondent's witness, Mr. John O'Neil, a geologist with respondent and assigned to the Glade Creek bridge project, testified that the sandstone in the area of pier 2 was "10 to 21 percent" harder then originally indicated in the pre-bid core samples. Mr. O'Neil further testified that, "...some of the sandstone was indeed harder than hard. It logged as very hard, based on compressive strength testing." Mr. O'Neil's testimony was consistent with that of claimant's expert, Dr. James W. Mahar. It is of particular interest to the Court that the prebid core samples of pier 2 indicated soft to hard rock, and no very hard rock. Mr. O'Neil's subsequent findings of very hard rock were the result of claimant's request for retesting and serve as the foundation for this equitable adjustment claim.
The retesting as to pier 2 is described in respondent's exhibit no. 7, Materials Inspection Report No. 1180771. The Report at paragraph 2.4.1 states that "the Department (respondent) has never had any intent to make any representation or description of the abrasive qualities of rock strata in soils information presented in contract documents, nor are there any standardized tests for abrasiveness of which we are aware."
The Court observes that no retesting of core samples was requested or made as to pier 3.
Although claimant was awarded this contract in November 1985, it did solicit bids from subcontractors for the caisson work until December 1985. Representatives of the subcontractor which was ultimately awarded the bid visited the respondent's office in Princeton, West Virginia, to inspect the core samples available to all prospective bidders. The subcontractor had not performed drilling operations in the State of West Virginia prior to this particular contract. The fact that the subcontractor was unfamiliar with the nature of subsurface strata in southern West Virginia may have been reflected in its bid which was substantially lower than the bids of other, more experienced contractors which have performed drilling projects in all areas of the State.
It appears from the evidence that certain geotechnical data were obtained by respondent during the design stage for this project. The data included unconfined compressive strength tests in some of the strata, but, as was the usual and customary practice during the pre-bid stage, this information was not made available to prospective bidders. While the information may have been of assistance to claimant herein at the pre-bid stage, the Court believes that it was withheld by inadvertence, and not by design. In the future respondent may wish to consider disclosing the availability of such information to prospective bidders.
*114 Whether or not the differing subsurface conditions previously described permit claimant the remedy of equitable adjustment is the issue this court will now address. Provision for equitable adjustment is made in section 104.2 of the West Virginia Department of Highways Standard Specifications of 1982. and reads in part as follows:
.... Should the Contractor encounter or the Department discover during the progress of the work subsurface or latent physical conditions at the site differing materially from those indicated in the Contract, or unknown physical conditions at the site of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inherent in work of the character provided for in the Contract, the Engineer shall be notified in writing of such condition; and if the Engineer finds the conditions do materially differ and cause an increase or decrease in the cost of, or the time required for performance of the Contract, an equitable adjustment will be made and the Contract modified in writing accordingly. (Emphasis added.)
Respondent also relies upon §104.2, and this Court finds the section to be operative and controlling in the contract between the parties. Accordingly, the Court will apply the section to the claims asserted for damages relating to the excess costs of constructing pier 3 and pier 2, respectively. Before undertaking this consideration, the Court must emphasize that §104.2 is not operative when a claimant fails to invoke the section and abide by its directives in a timely manner. Although claimant has demonstrated by a preponderance of the evidence that very hard rock was encountered, and not anticipated, this Court does not believe the circumstances excuse a strict interpretation of and compliance with §109.4 and §109.4.8, providing that:
Extra work performed in accordance with the requirements and provisions of 104.3 will be paid for at the unit prices or lump sum stipulated in the order authorizing the work, or the Department may require the Contractor to do such work on a force account basis to be compensated in the manner hereinafter prescribed.
The Contractor's representative and the (respondent's) Engineer shall compare records daily of the cost of work done as ordered on a force account basis, and shall indicate agreement by signature on such records. No payment will be made for work performed on a force account basis until the Contractor has furnished the Engineer with duplicate itemized statements.... (Emphasis added.)
Accordingly, the Court makes the following findings or fact and conclusions of law:
Pier 3
Claimant's subcontractor began drilling caissons for pier 3 on the project to pier 2. The plan was to drill a pilot hole with a 12-inch diameter carbide tricone bit, using sufficient down pressure and air circulation with medium drill bit rotation to produce a straight hole. The *115 hole was then enlarged using an 18-inch hole opener and then a 36-inch auger hole opener. This equipment was contained on a Williams LLDH-80 drilling rig. Using this process and equipment 38 caissons were drilled for pier 3. The progress of the drilling was slowed when very hard rock was encountered almost immediately. Foam and water were then utilized by claimant to increase drilling productivity, but this practice was suspended until adequate pollution safeguards were taken. In the interim a hole was attempted with air only resulting in substantial damage to the hole opener. Testimony suggests the hole opener "burned up" when the cutters became so hot that the bearings disintegrated. Concerned and falling behind the critical path (schedule), claimant resorted to what it described as "a radical change in drilling technique." Using 36-inch air barrels, a 36 inch thin wall core barrel, two additional hole openers, and foam and water, the caissons were completed, but not without additional cost. Despite the difficulties encountered at pier 3, Terry Allen Penn, General Manager for Permian Rat Hole, testified that "as far as our production and expenses on the job at that point, we still felt like we could make up the difference on pier 2." Since there was no intent to put forth a claim based upon a changed condition on pier 3, it appears to the Court that subcontractor consciously made the decision not to provide "notice" to respondent.
Respondent avers that the failure on the part of claimant to "notice" the respondent's engineer that there was a changed condition in pier 3, as required by §§104.2, 109.4, and 109.4.8, supra, resulted in the respondent not keeping force account records on the construction of pier 3 to ascertain actual costs in accordance with the Specifications. We cannot now speculate as to same. Respondent received notice that claimant was making a claim for pier 3 through correspondence received in February 1986, well after the completion of the pier.
Since claimant failed to provide timely notice to respondent as to the allegation of a changed condition, no force account records were maintained by respondent. Therefore the claim relating to pier 3 must be disallowed, consistent with the previously described sections, and the holding of Vecellio and Grogan, Inc. vs. Dept. of Highways, 14 Ct.Cl.451 (1983).
Pier 2
The Court now turns its attention to the issue of pier 2. Claimant has provided convincing evidence that unforeseeable subsurface conditions and abrasive rock were encountered, conditions which differed materially from those indicated in respondent's bid proposal. Claimant did provide the requisite notice to respondent concerning pier 2. Accordingly, claimant contends that the difficulties encountered entitle it to an upward equitable adjustment in the contract price under the terms of the "changed condition clause" of the "differing site condition clause" in §104.2, as cited supra.
By reason of the materially indifferent conditions encountered at pier 2, claimant incurred extra expense not contemplated under the contract. The claimant provided notice of the changed conditions to respondent by letter dated October 1, 1986, and same was acknowledged for investigation by respondent in its letter dated November 5, 1986. It is therefore uncontroverted that the requisite notice to invoke §104.2 was timely given and is operative and *116 controlling in this claim for pier 2 expenses. Claimant testified that 44 drilling shifts were estimated to drill the pier 2 shafts, but 298 drilling shifts were ultimately required to drill the very hard rock. The additional labor and equipment expense incurred for the additional shifts are the bases of this equitable adjustment is best set forth by this Court A. J. Baltes v. Dept. of Highways. 13 W. Va. Ct. Cl. 1 (1979), which states in part:
"The recoverable items of cost must be realistically confined to additional cost incurred by the claimant, wand which were directly and proximately caused by the changed conditions. Expenses which the contractor would have been required to expend in any event had no changed conditions occurred are not compensable as part of an equitable adjustment." Baltes at 6-7.
This Court therefore applies an "actual cost" theory as the appropriate measure of damages. Actual cost is defined in Baltes, supra, at 6, as "a daily cost analysis of the additional expenses required by the changed condition." In doing so the recoverable items as enumerated must be realistically confined to the additional costs incurred by the claimant. Expenses which the contractor would have been required to expend had no changed condition occurred are not compensable. See. Dale Ingram, Inc. v. United States, 475 F.2d 1177 (Ct. Cl. 1973).
The condition of "very hard rock" was not anticipated by claimant. The claimant was required to drill at substantially higher cost to complete pier 2, and the cost for that labor and equipment will be compensated. However, care must be taken to avoid duplications and overlap, with recovery limited to those costs directly and proximately caused by the changed conditions. In particular, the evidence concerning additional equipment for road maintenance, extra grader and operators appears redundant, if not unrelated.
The Court finds that claimant was in part responsible for the increased costs by not exercising greater diligence in preparing and estimating its project bid. It is uncontroverted that claimant's bid was substantially lower than others received. Although the Court does not adopt respondent's argument that, "the four-fold increase in actual versus estimated time of drilling is attributable to lack of knowledge of local conditions combined with inadequate examination and testing of core samples," the Court is of the opinion that claimant must shoulder some responsibility for its bid.
Claimant's request that the Court award the cost of "travel and sustenance" will not be considered. Claimant has failed to prove that local labor was unavailable. Furthermore, these costs were not a part of the stipulated labor rate.
The Court therefore considers only the following in its determination of recoverable costs, pursuant to §§109.4 to 109.4.7, which the evidence indicates to be the direct and proximate result of the changed conditions of pier 2:
Labor - $ 50,349.00
*117 Mark up on Labor-20,140.00
Equipment rental-subcontractor owned)-213,033.00
Equipment rental-(non-owned) 19,350.00
Mark up on non-owned equipment 3,870.00
Clean out costs for caisson holes-35,076.00
Welding subcontractors 20,000.00
Expendables - 80,000.00
TOTAL FOR MEREDITH
PERMIAN RAT HOLE $441, 818.00
These costs incurred by claimant Westbroook which were the result of the changed conditions at pier 2 have also been considered by the Court. The Court is of the opinion to and does make an award to Westbrook in the amount of $119,397.46.
The Court has considered interest on the total award of $516,251.46 in accordance with Provision 9 of the contract which provides for the rate of six (6) per centum per annum. As calculated, the interest to the issue date of this opinion is awarded in the amount of $52,030.46. Therefore, the total amount of the award is $613,245.92.
Award of $613,245.92.