# DYNCORP INFORMATION SYSTEMS, LLC, Plaintiff,

v.

# The UNITED STATES, Defendant.

## No. 01–16C.

United States Court of Federal Claims.

Nov. 10, 2003.

---

Gregory A. Smith, Washington, DC, for plaintiff. William J. Crowley, Piper Rudnick, LLP, of counsel.

Thomas D. Dinackus, Washington, DC, with whom was Assistant Attorney General Peter D. Keisler, for defendant. F. Jefferson Hughes, U.S. Department of Justice, and Roger B. Sabin and Patricia A. Papas, U.S. Defense Information Systems Agency, of counsel.

## *OPINION*

MILLER, Judge.

This case is before the court after argument on the parties' cross-motions for partial summary judgment with respect to Count I of plaintiff's complaint and defendant's motion for partial summary judgment with respect to Count IV. The effective date of the contract in question, January 1, 1990, preceded the date of execution, September 3, 1991. Count I puts in issue whether Federal Acquisition Regulation ("FAR") cost principles in effect on the contract's effective date or those in effect on the date of execution govern the contract. The contract incorporated by reference the Department of Defense Federal Acquisition Regulation Supplement ("DFARS") providing that, when costs are a factor in determining the contract price adjustment, such costs shall be determined in accord with the FAR and DFARS "in effect

on the date of this contract." DFARS § 252.243–7001 (Apr.1984). Count IV concerns whether the Government's unilateral definitization of price was fair and reasonable under applicable regulations.

## FACTS

The following facts are undisputed, unless otherwise indicated.

### 1. *Count I*

DynCorp Information Systems, LLC ("plaintiff"), now owns the Automatic Digital Network (the "AUTODIN"), a network that affords the Department of Defense ("DOD") secure, immediate, and accurate communication service within minutes between any two points in the world. Plaintiff (and its predecessors) continue to provide this service to DOD. The pivotal time frame in this case involves AUTODIN services provided between January 1, 1990, and September 3, 1991, prior to the execution of a signed contract. Plaintiff agreed to continue delivering AUTODIN services after the previous contract expired on December 31, 1989, and the cognizant agency of DOD agreed to recompense plaintiff, at least provisionally. A thorough understanding of this case, however, requires a chronological discussion of the events leading up to, as well as those following, this 20–month period.

Western Union designed and began to operate the AUTODIN network in the 1960's. Plaintiff's predecessor acquired the assets for the AUTODIN system from Western Union on May 1, 1986. More specifically, American Satellite Company ("ASC") acquired Western Union's Government Systems Division on that date.[1] ASC was a subsidiary of Contel Corporation. The Government Networks Division of Contel ASC merged with Contel Federal Systems ("Contel FS") on January 1, 1989, and Contel FS merged into GTE Corporation on January 1, 1992.[2] These entities

---

1. A time line of events, submitted to the court by plaintiff at oral argument, as corrected by defendant, indicates that this date was April 30, 1986. No relevance is attached to this discrepancy.

2. Defendant admitted that the "portion of Contel that was responsible for the AUTODIN contract

was made part of GTE Government Systems Corporation in 1991." Def.'s Resp. to Pl.'s Proposed Findings of Fact No. 3, filed Mar. 26, 2003. Based on the time line and defendant's corresponding comments at oral argument, it appears that Contel FS and GTE first were joined on

will be referred to as plaintiff or plaintiff's predecessors, as plaintiff purchased the unit of GTE Government Systems running AUTODIN and became DynCorp Information Systems, LLC in 1999.

On May 1, 1986, a novation agreement between Western Union, plaintiff's predecessor and the Government became effective, precluding "[p]laintiff from passing on any increased asset costs to the government under contracts in place at the time." [3] Def.'s Resp. to Pl.'s Proposed Findings of Fact No. 6, filed Mar. 26, 2003. After an audit, the Defense Contract Audit Agency (the "DCAA") concluded in a report dated January 11, 1995, that Generally Accepted Accounting Principles ("GAAP") required plaintiff's predecessor to use the purchase method of accounting. Cost Accounting Standards ("CAS") 404 and 409 required depreciation based on capitalized values.

Between 1987 and 1989, AUTODIN services were provided pursuant to pricing agreements reflected in tariffs filed with the Federal Communications Commission (the "FCC"). Communication Service Authorizations ("CSA's") signed by the parties documented these agreements. The last such CSA was signed in November 1989 and covered the period from January 1, 1989, to December 31, 1989. Defendant protests plaintiff's claim that this CSA was the last AUTODIN contract subject to the 1986 novation agreement. *See* Def.'s Resp. to Pl.'s Proposed Finding No. 7. In defendant's view, Contract DCA 200–86–H–0001, in place as of May 1, 1986, and therefore subject to the novation agreement, continued until DOD determinated it on April 6, 1993.

DOD's Defense Communication Agency, Defense Commercial Communication Office ("DCA–DECCO"), issued Request for Proposal ("RFP") No. DCA 200–90–R–0035 on February 20, 1990, such that AUTODIN service would be provided during the base year, calendar year ("CY") 1990, with five optional one-year extensions.[4] Plaintiff's predecessor issued an initial response to the RFP on June 8, 1990, and an updated response on July 13, 1990. This proposal "assumed the applicability of the 1976 [Memorandum of Understanding discussed *infra*], and included the depreciation cost associated with the AUTODIN assets acquired from Western Union in 1986 and assignable to the period from January 1, 1990 to October 31, 1993 (the last forty-six months of the assets' 7–1/2 year useful life)." Compl. filed Jan. 8, 2001, ¶ 20. Shortly thereafter, on July 23, 1990, FAR § 31.205–52 became effective, providing that "[w]hen the purchase method of accounting for a business combination is used, allowable amortization, cost of money, and depreciation shall be limited to the total of the amounts that would have been allowed had the combination not taken place."

Although the parties disagree whether a contract was in effect during this period, plaintiff provided AUTODIN service and was paid using CY 1989 rates. Plaintiff asserts that it continued DOD's AUTODIN service "without any formal contractual arrangement being in place," Pl.'s Prop. Finding No. 11, filed Jan. 7, 2003, but defendant maintains that Contract DCA 200–86–H–0001 remained effective until April 6, 1993.

In January 1991 Peter G. Smingler began serving as contracting officer for DCA–DECCO. On February 15, 1991, plaintiff and Mr. Smingler agreed that the price for the CY 1990 service would be $28.1 million. A document signed on April 11, 1991, by Michael D. Campbell, President of Government Networks Group, and Mr. Smingler memorialized this agreement and committed it to finalization in a contract "which will be signed on or about 19 April 1991." The Government's Notice of Award of Letter Contract

---

January 1, 1992, as indicated in plaintiff's complaint.

3. May 1, 1986, also marked the implementation of Contract DCA 200–86–H0001. As discussed below, defendant argues that this contract remained in effect until April 6, 1993, while plaintiff maintains that no contract was in effect as of December 31, 1989.

4. Plaintiff claims that it notified DOD that it would seek to recover the remaining allocable depreciation both "prior to and following the issuance of the RFP." Compl. filed Jan. 8, 2001, ¶ 19.

No. DCA 200–91–C–0024 dated May 1, 1991, authorized plaintiff to "provide the AUTO-DIN services anticipated in accordance with the Statement of Work detailed in RFP DCA 200–90–R–0035." According to the letter, CY 1990 served as the base year, while CY's 1991–1999 were option years.

As the Government explained in an interrogatory response, Mr. Smingler "discovered that there was no document providing contract coverage other than the 1986 Basic Agreement and CSA AMSC OC 85059 (Sep. 26, 1989). Accordingly, Mr. Smingler deemed it appropriate to have the Letter Contract cover AUTODIN services from January 1, 1990, forward." Def.'s Resp. to Pl.'s Interrog. No. 7, Mar. 1, 2002. The pricing proposals reflected the assumption that the contract's effective date would be January 1, 1990. Moreover, defendant hastens to point out that plaintiff's predecessor did not object to making the base year CY 1990.

Plaintiff's predecessor signed the Letter Contract on August 27, 1991. Mr. Smingler signed the same on September 3, 1991,[5] and issued Modification P00001, which recites its purpose as exercising Option Year 1 of the contract from January 1, 1991, to December 31, 1991. The Letter Contract lists January 1, 1990, as the effective date.

The Letter Contract incorporates a number of contract clauses including FAR § 52.216–25 (Apr.1984), the Contract Definitization clause, which provides that a "fixed price definitive contract is contemplated" and that the terms will include "all clauses required by [FAR] and [DFARS] on the date of execution of the letter," as well as "all clauses required by law on the date of execution of the definitive contract" and "any other

mutually agreeable clauses, terms and conditions." The clause also provides:

> If agreement on a definitive contract to supersede this letter contract is not reached by the target date in paragraph (b) above, or within any extension of it granted by the Contracting Officer, the Contracting Officer may, with the approval of the head of the contracting activity, determine a reasonable price or fee in accordance with Subpart 15.8 and Part 31 of the FAR, the 1976 DCA/Contel (Western Union) Memorandum of Understanding, and such applicable FCC Regulations, subject to Contractor appeal as provided in the Disputes clause.

*Id.*[6] The same base year was incorporated into the May 1, 1991 Notice of Award and the Letter Contract. Plaintiff disputes defendant's contention that the reference to the Memorandum of Understanding ("the MOU") was added at the request of plaintiff alone. According to plaintiff, on the contract execution date, the parties had not decided whether FCC tariffs or FAR requirements would govern the contract.

Defendant notes that, before September 3, 1991, plaintiff's predecessor never asserted that FAR § 31.205–52 was inapplicable because the January 1, 1990 effective date predated the regulation. Plaintiff disclaims ever denying its applicability, given that DOD never declared the stepped-up costs unallowable under FAR § 31.205–52 prior to September 3, 1991. Plaintiff points out that its proposals of June 8, 1990, July 13, 1990, and May 1, 1991, were priced to satisfy FCC regulations, rather than FAR requirements and that the DCAA's 1990 audit report concluded that plaintiff was entitled to recover stepped-up asset costs. Defendant presses that after execution of the Letter Contract, during the definitization negotiations, plain-

---

**5.** The date-signed block of the Letter Contract for the contracting officer's signature is not legible; however, the parties agree that Mr. Smingler signed on September 3, 1991. Moreover, the signature date of Modification P00001, which was executed simultaneously, is September 3, 1991, and the cover letter also are dated September 3, 1991.

**6.** Plaintiff, while admitting that the 1976 Memorandum of Understanding (the "MOU") was referenced in the contract, contends that it is rele-

vant to neither the parties' cross-motions for summary judgment on Count I nor defendant's motion for summary judgment on Count IV. The MOU relies on FCC tariff regulations, whereas the Letter Contract was definitized in accordance with FAR and DFARS, as the February 2, 1994 DECCO report notes. Moreover, in regard to Count IV, plaintiff asserts that only the FAR requirements are relevant; the MOU would not affect whether the price was fair and reasonable.

tiff still failed to offer its argument that the effective date of the contract predated FAR § 31.205–52. Plaintiff responds that its failure to do so resulted from a DECCO Price Analyst's assumption that the contract was initiated in 1991. Moreover, plaintiff chides the DOD for inconsistency in its arguments concerning the applicability of FAR § 31.205–52 and for not reducing to writing until April 1993 the position that it has asserted.

During the two years following execution of the Letter Contract, plaintiff's predecessor and DCA–DECCO attempted definitized priced negotiations.[7] The parties failed to agree to a definitized price by October 1993, and the contracting officer unilaterally definitized the Letter Contract price through Modification P00009, dated February 24, 1994.

This price did not include plaintiff's costs related to the former Western Union assets based on the stepped-up book value in 1986. Plaintiff cites FAR § 31.205–52 as the only reason for the denial of these costs, while defendant argues that additional reasons supported the contracting officer's decision. Defendant quotes other portions of Mr. Smingler's letter of May 5, 1994, indicating that the contractor "failed to support the reasonableness of the basis upon which he proposed stepped up assets." The same letter states that the parties had negotiated a price for the AUTODIN services provided in CY 1990 which the contracting officer found to be fair and reasonable, although it "contained no recognition of or allowance for the 'stepped up assets' issue proposed by the contractor."

Plaintiff, on June 24, 1994, submitted a certified claim seeking an upward adjustment in the contract price as determined by Modification P00009. Plaintiff sought upward adjustments in five categories, including the costs associated with the stepped-up basis of the Western Union assets. In June 1995 the parties settled these claims, with the exception of the stepped-up assets costs.

Plaintiff's motion for partial summary judgment asks for a ruling that the regula-

tions applicable to the Letter Contract allow plaintiff to depreciate the Western Union assets; and moving against this claim, defendant seeks judgment in its favor that the date on which the Letter Contract was signed by the contracting officer governs, so that depreciation is not available.

### 2. *Count IV*

Plaintiff claims a contract price adjustment to allow for a fair and reasonable price covering the contractor's actual and estimated book costs, including the costs associated with the purchase of the Western Union assets, and a reasonable profit.

The parties agreed that plaintiff should receive a "reasonable price" per the Letter Contract's Definitization clause, which incorporates by reference Subpart 15.8 of FAR and Part 31 of FAR, the 1976 MOU, and applicable FCC regulations. FAR § 15.802(b) (1990), provides that contracting officers must "[p]urchase supplies and services from responsible sources at fair and reasonable prices," while FAR § 31.102 (1990), "Fixed-price contracts," provides that "notwithstanding the mandatory use of cost principles, the objective will continue to be to negotiate prices that are fair and reasonable, cost and other factors considered."

The parties bilaterally agreed to a price of $28.1 million for AUTODIN services in CY 1990. The contracting officer unilaterally definitized years 1991–1993 at approximately $19 million, $21 million, and $18 million, respectively. Plaintiff's projected costs for those years were $26.9 million, $27.7 million, and $28.3 million.

As plaintiff explains, by depreciating the AUTODIN assets on a stepped-up basis, plaintiff could recover a portion of its investment. Plaintiff contends that GAAP, as well as CAS 404 and 409 required plaintiff to use the purchase method of accounting. Accordingly, plaintiff recorded the value of the Western Union assets at an amount equal to the price paid in 1986, which was less than the assets' fair market value and depreciated

---

7. Plaintiff's predecessor submitted multiple proposals between May 1, 1991, and August 14, 1992, and contends that negotiations began in

mid–1993. Defendant sets the commencement of negotiations on December 10, 1991, with fact-finding commencing two months prior.

the new book value through October 1993 on a straight-line basis. Defendant agrees that plaintiff was obliged to depreciate the new book value over the projected useful life of the assets, but argues that the straight-line basis, while permitted, was not required. Moreover, defendant contests the propriety of using the amount plaintiff paid for the assets to determine the depreciation of the AUTODIN assets and the appropriateness of the seven and one-half year period.

DECCO's Rates Analysis Officer found that the stepped-up assets were unallowable because plaintiff's predecessor had used the purchase method of accounting, which triggered FAR § 31.205–52, prohibiting costs for stepped-up assets from the business combination. The corresponding January 11, 1995 Audit Report by the DCAA recommended disallowance of the stepped-up asset costs. The report stated that the allowability of costs is "determined by the particular cost principles incorporated into each contract;" therefore, FAR § 31.205–52 applied and the stepped-up assets were unallowable. In taking this position, however, the DCAA relied on the contracting officer's finding that the effective date of the contract was September 1991.

An earlier Audit Report, issued April 22, 1993, stated that "costs relating to asset write-ups in accordance with GAAP are generally allowable for contracts entered into before 23 July 1990." For contracts entered into after July 22, 1990, "which is our interpretation of the events surrounding this [Letter] contract, the amount of amortization, depreciation, and cost of money associated with business combinations accounted for under the purchase method of accounting is limited to the amount that would have been allowable had the combination never taken place." Accordingly, the DCAA "questioned the proposed amount of $51,502,165 in usage fees." Plaintiff, however, observes that each not-to-exceed ("NTE") amount for Option Years 1–3 totaled approximately $30 million and points to an August 1993 meeting with DECCO's Rates Analysis Division personnel indicating that the Government considered paying the full NTE amount as a legitimate option for negotiating a fair and reasonable price.

Defendant's cross-motion for partial summary judgment seeks a ruling that the contracting officer's decision was a fair and reasonable determination of price. Plaintiff expresses dismay at this argument, citing the recognized fallibility of summary judgment in a *de novo* proceeding for resolving whether a price is reasonable.

## DISCUSSION

### I. *Count I*

#### 1. *Summary judgment standards*

RCFC 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1323 (Fed.Cir.2001). Having cross-moved, each party bears the burden of demonstrating entitlement to judgment, as well as the absence of issues of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

#### 2. *Relevant DFARS and FAR provisions*

FAR and DFARS issue pursuant to statutory authority and in conformance with required statutory and regulatory procedures. FAR § 1.301(b) (2002). These regulations consequently have the force and effect of law. *See Newport News Shipbuilding & Dry Dock Co. v. Garrett*, 6 F.3d 1547, 1552 (Fed.Cir. 1993) (FAR § 33.207(c)(2) was binding on courts, not merely an interpretive regulation). Contractors are expected to know FAR provisions. *General Eng'g & Mach. Works v. O'Keefe*, 991 F.2d 775, 780 (Fed.Cir. 1993). Courts interpret FAR provisions based on their plain language and common meaning. *See Xerxe Group, Inc. v. United*

*States,* 278 F.3d 1357, 1359 (Fed.Cir.2002) (interpreting FAR §§ 15.608–15.609 (2001)).

Among the several FAR and DFARS provisions that apply to this case, the most significant is FAR § 31.205–52 "Asset valuations resulting from business combinations." This regulation became effective July 23, 1990, and provided, as follows:

> When the purchase method of accounting for a business combination is used, allowable amortization, cost of money, and depreciation shall be limited to the total of the amounts that would have been allowed had the combination not taken place.

Another important regulation is DFARS § 252.243–7001, "Pricing of Adjustments (APR 1984)," which states: "When costs are a factor in any price adjustment under this contract, the contract cost principles and procedures in FAR part 31 and DFARS part 231, in effect on the date of this contract, apply."

The parties also reference FAR § 31.102 (1990), "Fixed price contracts," which provided, as follows:

> The applicable subparts of part 31 shall be used in the pricing of fixed-price contracts, subcontracts, and modifications to contracts and subcontracts whenever (a) cost analysis is performed, or (b) a fixed-price contract clause requires the determination or negotiation of costs. However, application of cost principles to fixed-price contracts and subcontracts shall not be construed as a requirement to negotiate agreements on individual elements of cost in arriving at agreement on the total price. The final price accepted by the parties reflects agreement only on the total price. Further, notwithstanding the mandatory use of cost principles, the objective will continue to be to negotiate prices that are fair and reasonable, cost and other factors considered.

### 3. *The parties' positions*

Plaintiff argues for partial summary judgment on the issue of liability only, asserting that summary judgment is appropriate for resolving Count I. Defendant agrees that in regard to Count I no genuine issues of material fact are present, but maintains that judgment should enter in its favor. Because the rule requiring attorneys to confine arguments on appeal to those raised before the trial court fails to command observance, the court sets forth all arguments that the parties have advanced in the six briefs that have been filed on the pending summary judgment motions. Moreover, defendant cautions that, even if the court should rule in favor of plaintiff on Count I, plaintiff "will not be entitled to judgment with regard to entitlement." Def.'s Br. filed July 21, 2003 at 2, n. 3, so liability concerns still may lurk.

Plaintiff grounds its motion on the principle that "regulations adopted after the contract's effective date (or the date on which the parties contractual obligations commence), cannot apply to that contract." Pl.'s Br. filed May 30, 2003, at 2. As plaintiff interprets the law, the parties can designate the effective date of a contract to precede the award date, and that date governs the applicable law and regulations. In this case that date would be January 1, 1990, the effective date so designated by the parties. Both parties specifically agreed to the retroactive effective date to govern their obligations to one another.

Plaintiff aptly characterizes the parties' relationship and dealings: "[P]arties to the AUTODIN contract ... had an on-going contractual relationship prior to and after the effective date of January 1, 1990 under a contract that required the contractor to provide unique services to the government." Pl.'s Br. filed Jan. 7, 2003, at 29–30. Indeed, plaintiff was the only AUTODIN service provider, and no dispute exists that continued services without a written agreement were expected. "The Letter Contract executed in 1991, with an effective date of January 1, 1990, formalized and confirmed the existence of the earlier relationship." *Id.* at 30.

Plaintiff also contends that the language in the Definitization clause stating that the definitive contract will include "all clauses required by the Federal Acquisition Regulation (FAR) and the Defense Federal Acquisition Regulation Supplement (DFARS) on the date of execution of the letter contract," is inapplicable to any argument concerning FAR Part

31, because those cost principles are "regulations," not "clauses." *Id.* at 35. FAR clauses are relegated to Part 52; FAR cost principle § 31.205–52 is a regulation, not a "term or condition used in contracts or in both solicitations and contracts ...." FAR § 2.101.

Defendant relegates plaintiff's argument to the "false" premise that, unless agreed otherwise, "a contract's effective date governs for all purposes, even when the effective date predated contract execution." Def.'s Br. filed Mar. 26, 2003, at 6. "The Government's position is that the contract's effective date determines which AUTODIN services were governed by the contract (those provided on and after January 1, 1990), while the date of the contract's formation (September 3, 1991) determines which version of the cost principles applies to the contract." Def.'s Br. filed July 21, 2003, at 31 n.39.

In defendant's view, the effective date does not necessarily supersede the date of execution for all purposes. Defendant minimizes the significance of including services provided over the past 20 months: The backdating was done only "to make services that had been provided to the Government pursuant to other means, subject to the contract." Def.'s Br. filed July 21, 2003, at 5.

DFARS § 252.243–7001 "Pricing of Adjustments" specifies that "costs shall be in accordance with Part 31 of the Federal Acquisition Regulation and Part 231 of the DOD FAR Supplement in effect on the date of this contract." Defendant focuses on the language "in effect on the date of the contract," asking the court to consider the parties' intent, their actions, and the nature of the cost principles to resolve an alleged ambiguity.

Plaintiff rejects any ambiguity. The execution date became irrelevant after the parties chose the effective date as January 1, 1990, according to plaintiff. Moreover, plaintiff insists that as a standard-form clause, the intent of the parties is irrelevant. DFARS § 243.205(S71) (1990), required the inclusion of DFARS § 252.243–7001; the parties did not negotiate this term, which made irrelevant their intent. Plaintiff, instead, begins with examining the meaning of the language

in its plain text. Extrinsic evidence may not be introduced unless an ambiguity is present. *McAbee Constr., Inc. v. United States,* 97 F.3d 1431, 1433–34 (Fed.Cir.1996). Plaintiff draws from this rule that the contract's January 1, 1990 effective date must be construed to be "the date of this contract" for all purposes, unless otherwise prescribed. Even if extrinsic evidence were considered, plaintiff maintains that the parties never agreed to apply the cost principles in effect on the execution date.

Defendant dismisses the case law cited by plaintiff as inapposite in that it does not address the situation at issue: the interplay between the effective date preceding the date of execution and the outcome depending on which version of the cost principles is applied to the contract. Defendant thus contends that plaintiff has failed to establish that a "contract's effective date governs for all purposes, or that a contract's effective date determines the cost principles that apply to a government contract." Def.'s Br. filed Mar. 26, 2003, at 16.

The parties modified standard clause FAR § 52.216–25 so that subsection (c) stated that the contracting officer may determine a reasonable price "in accordance with Subpart 15.8 and Part 31 of the FAR, the 1976 DCA/Contel (Western Union) Memorandum of Understanding, and [such] applicable FCC regulations." The MOU provided that the Government would not pay depreciation upon fully-depreciated assets, but would remit to the contractor a 4% management fee based upon the contractor's total cost, including the fully depreciated assets. Defendant views the agreement as establishing that the stepped-up assets would not be depreciable. At oral argument defendant explained:

> [T]he 1976 MOU addresses fully depreciated assets, and what we have in this case is something somewhat different. What the 1976 MOU addressed was a situation where a contractor purchased assets for use in a contract, had then fully depreciated them down to zero, and then was not able to recover any further depreciation. What we have here is a situation where a previous contractor had purchased those auditing assets, fully depreciated them

down to zero, and then a subsequent contractor purchased those asset[s], and pursuant to accounting principles was allowed to step them up.

Transcript of Proceedings, *DynCorp Info. Sys. v. United States,* No. 01–16C, at 66–67 (Fed.Cl. Sept.23, 2003) ("Tr."). Defendant consequently would apply the MOU because: 1) The MOU was incorporated for some reason; 2) it preserves the pricing approach used prior to the Letter Contract; 3) it is fair in that it favors neither the Government nor the contractor; 4) plaintiff was placed on notice that the 1976 MOU would be relevant to the pricing of this contract.

Plaintiff disagrees that the 1976 MOU addresses stepped-up assets at all. The MOU concerned the computation of tariffs for communications services, including AUTODIN, that Western Union provided DOD. Plaintiff's predecessors followed the MOU while AUTODIN remained tariffed. Because the assets were not "fully depreciated *by Plaintiff* until November 1993," the "MOU has no relevance to stepped-up assets." Pl.'s Br. filed May 30, 2003, at 25.

Plaintiff and defendant continue to dispute who first informed whom of the applicability or inapplicability of the FAR in question.[8] Defendant contends that the Government informed plaintiff's predecessor that FAR § 31.205–52 would apply prior to the execution date and that plaintiff never argued that the regulation was inapplicable because its promulgation postdated the effective date of the contract. Nor did plaintiff make this argument during the attempt to definitize bilaterally after the contract's execution, defendant argues. The contracting officer deemed FAR § 31.205–52 to be applicable, so the costs associated with the stepped-up assets were not included. Because none of plaintiff's predecessors asserted that the applicability of the FAR in question depended on the effective date of the Letter Contract, defendant terms plaintiff's latest argument a "post-*hoc* [sic] attempt to re-write the con-

tract's history and interpretation." Def.'s Br. filed Mar. 26, 2003, at 26.

Finally, as a policy matter, defendant warns against applying the January 1, 1990 cost principles because policy dictates the application of the current, most up-to-date version of the FAR. The "current version of the cost principles represents the Government's current policy with regard to cost allowability, and is—in the Government's view—superior to all previous versions of the cost principles." *Id.* at 27. Accordingly, the court should not apply cost principles inconsistent and inferior to the policies in place when the contract was executed. Advance agreements will not make unallowable costs allowable. It would be unfair to other contractors entering into contracts at the same time to afford the benefit of older preferential accounting treatments.

[DEFENSE COUNSEL]: The cost principles represented government policy with regard to the costs that the government will reimburse in a government contract, and by September 1991, the government had decided as a matter of policy that it was not going to reimburse costs associated with stepped up assets. And allowing [plaintiff] to recover these costs in this contract would be tantamount to granting special consideration for [plaintiff,] because all the other contractors who entered into contracts in September 1991 with the DOD got the pricing of adjustments clause in their contract, and were subject to FAR 31.205–52.

Tr. at 49–50.

Plaintiff notes the difference between the CAS, at FAR § 52.230–2, and future FAR cost principles. Contractors specifically agree to abide all CAS in effect on the date the contract is awarded, and "any CAS (or modifications of CAS) which hereafter become applicable." FAR 52.230–2(a)(3) (2002). No equivalent express obligation acknowledges the applicability of compliance with future FAR cost principles.

8. Plaintiff argues that in the first audit DOD rejected plaintiff's stepped-up asset costs pursuant to FAR § 31.205–49, which deals with goodwill, and not FAR § 31.205–52. Defendant argues that the first audit is irrelevant because a subse-

quent audit indicated that FAR § 31.205–52 would apply and would prohibit recovery of stepped-up asset costs. Because DOD communicated this change in position, defendant would bind plaintiff to it by acquiescence.

### 4. The limitations of the case law

Plaintiff cites cases for the proposition that the effective date of a contract controls for all purposes, while defendant argues that no case has addressed the precise issue in question. Furthermore, it should be noted that Board of Contract Appeals (the "BCA") opinions are not binding precedent on the Court of Federal Claims. The court may accept those BCA opinions that are considered to be helpful authority. *Honeywell, Inc. v. United States,* 870 F.2d 644, 649 (Fed.Cir.1989).

*Dale Ingram, Inc. v. United States,* 201 Ct.Cl. 56, 475 F.2d 1177 (1973), is advanced for the proposition that regulations promulgated after a contract's effective date are inapplicable to that contract. Plaintiff argues that the "law authorizes the parties to agree to an effective date from the commencement of contract obligations that differs from the date of execution." Pl.'s Br. filed May 30, 2003, at 6. *Dale Ingram* suggests that both the effective date and the date of formation were the same: December 19, 1960. *See* 201 Ct.Cl. at 75, 475 F.2d at 1187. This case did not reconcile any question concerning the date of execution. The United States Court of Claims thus concluded unremarkably that a regulation promulgated on December 31, 1960, was inapplicable to a contract with an effective date 12 days earlier. *Id.*

In *H.Z. & Co.,* 1985 ASBCA LEXIS 760, 85–2 BCA (CCH) P17,979, 1985 WL 16651, the BCA determined that the language of a contract modification was not clear. 1985 ASBCA LEXIS 760 at *17, 1985 WL 16651. The change order was signed on February 22, 1983, but the effective-date block was backdated to February 16, 1983. The disagreement in *H.Z. & Co.,* however, did not involve the discrepancy between the February 22 and February 16, 1983 dates, but whether the modification would be effective on February 16, 1983, or retroactive to the initiation of the contract, which was awarded and accepted in September of 1982. The BCA held that an ambiguity entailed a construction against the Government, the drafter, and thus that, as of February 16, 1983, "the parties agreed to modify their agreement retroactively to the beginning of the

contract." *Id.* 1985 ASBCA LEXIS at *17, 1985 WL 16651. That was irrelevant, however, to the extent that the BCA deemed the modification to be a new legal agreement; because there was no new consideration and no benefit to the Government for entering into the change order, the modification was invalid and given no effect. Plaintiff's reading that this case indicates that contracting parties mutually may select an "effective date" different from the date of execution is an overstatement, although the BCA did cite *M. Ten Bosch, Inc.,* 1974 ASBCA LEXIS 168, 74–2 BCA (CCH) P10,744, 1974 WL 2017, for that proposition.

*M. Ten Bosch* does give significance to the effective date. Had the contractor accepted the modification in question, the 60–day performance period would have begun on the effective date, March 16, 1970. The first modification was sent to the contractor for signature on March 13, 1970. Thus, the effective date would not necessarily have preceded the execution date, which is the issue in the case at bar. Furthermore, the March 16, 1970 effective date was irrelevant to the actual outcome of the case, because the contractor rejected the modification as originally proposed and returned a modification with revisions signed on May 25, 1970. The Government drafted another modification with an effective date of June 10, 1970, and an execution date of June 17, 1970. Rejecting the Government's unilateral establishment of May 25, 1970, as the beginning of the 60–day performance period, the BCA recognized the June 10, 1970 effective date of the agreed-to modification, so that the contractor was not in default on July 25, 1970, for failure to deliver. Because the original effective date "ceased to have any contractual significance," 1974 ASBCA LEXIS at *3, 1974 WL 2017, when the contractor rejected the modification, as originally proposed, *M. Ten Bosch* is not directly on point.

In *Northrop Worldwide Aircraft Services, Inc.,* 1996 ASBCA LEXIS 228, 96–2 BCA (CCH) P28,574, 1996 WL 549346, plaintiff finds support for the proposition that parties may set their own effective date for purposes of applicable cost principles and that date will control the applicability of FAR regula-

tions. The contract stipulated that payments would be made to the contractor in accordance with FAR cost standards "in effect on the date of this contract" and included a standard clause providing that the contract was subject to the written approval of the Secretary of the Army and "would not be binding until so approved." 1996 ASBCA LEXIS 228 at *6 nn. 2, 3, 1996 WL 549346. The date of approval was later than both the date on which the Government executed the contract and the date in the effective-date box. Because the parties can agree to an effective date that differs from the date of execution, the BCA concluded that the contract stipulated that the "effective date of the contract would be later than the date in the effective date block on the standard form." 1966 ASBCA LEXIS 228 at *15, 1996 WL 549346.

Although *Northrop* recognizes that the parties can designate an effective date different from the date of execution by the Government, defendant would distinguish this case because the BCA also stated that the "law governing contract formation is that a contract does not come into effect until required higher Government approval is given." *Id.* at *15, 1996 WL 549346. The proposition is accurate, but the context refers to an express condition of government approval, not the significance of the date of execution in a vacuum.

*Northrop* is distinguishable in that, although originally the SF 26 reflected that the date of execution and the effective date were the same, the parties subsequently agreed via a modification to a prospective effective date, upon the approval of the Secretary of the Army. The BCA decided that the contract did not come into effect prior to the Secretary's approval and therefore applied a regulation that had come into effect after the original effective date on the SF 26. *Northrop* has little pertinence to the case at bar where a binding contract was not conditioned on required government approval and where the effective date of the contract had been keyed to contract performance that was ongoing long before the new FAR regulation came into effect.

The parties also dispute the holding in *DeMatteo Construction Co. v. United States,* 220 Ct.Cl. 579, 600 F.2d 1384 (1979). In the context of a plaintiff's claim for an unreasonable suspension of work during a bid protest, the Court of Claims announced that "[r]egardless of the date of execution the parties could make the effective date of the contract and its clauses any date they chose." *Id.* at 587, 600 F.2d at 1389. The court recognized two contending effective dates for activating the Government's obligation under the suspension of work clause—the date on which the contracting officer retroactively dated it or the later date on which the contractor returned the executed contract and the required bonds. Significantly, the court stated that defendant did not argue that the clause had no applicability until after the "formal signing" *id.,* which took place even later. Because the court based its decision on the reasonableness of the length of the delay period, and specifically found it unnecessary to decide which effective date controlled, *DeMatteo* illustrates only the principle that the effective date of a contract is not a rigid concept, but one that the parties can fix to take account of the realities of when they have agreed to be bound.

In the case most factually analogous to the case at bar, *Opportunities Industrialization Centers of America, Inc.,* 1984 DOL BCA LEXIS 18, 84-2 BCA (CCH) P17,501 ("*OIC*"), an oral agreement on January 15, 1979, preceded reduction of the agreement to writing on April 9 and 11, 1979. The contract recited an effective date of January 15, 1979. The BCA determined the applicability of the certification requirement of the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (2000) (the "CDA"), which became effective in the interim. The CDA applied to contracts entered into on or after March 1, 1979, and the certification requirement was inapplicable to certain post-CDA claims under pre-CDA contracts, such as the one on review. The BCA concluded that the contract became effective upon the verbal agreement on January 15, 1979, the recited effective date, prior to the dates on which the parties signed the contract. The BCA explained:

It seems clear, from the previous and continuing relationship between OIC and DOL, their close association in the development of the career exploration program, and the limited duration of one year initially set for performance of the start-up, administration, and evaluation of the plan envisioned in that program that both parties agreed and understood in January of 1979 that OIC had to begin work under the contract immediately so that the contemplated full year of performance could be completed by January 15, 1980. That is to say, both parties appear to have taken it for granted that OIC had to start work in January of 1979 in order to discharge its contract obligations by January of 1980, and that it did begin work before the contract was signed. The inference seems unavoidable that the parties considered their contract to be effective as soon as they reached agreement. They did not contemplate delay until the time when the intended formalization was accomplished. Under those circumstances, general contract law principles hold, and accordingly we do also, that the subject contract was entered into January 15, 1979, prior to the coming into effect of the Contract Disputes Act, I WILLISTON ON CONTRACTS (3rd. ed.) §§ 28, 28A, at pp. 67, 69, 72–3. 1984 DOL BCA LEXIS 18, at *32–33.

In the case at bar, no express contract, oral or otherwise, existed prior to the execution date of September 3, 1991. "Rather, the parties entered into the Letter Contract on September 3, 1991, and agreed that the contract would reach back to govern the services that had been provided from January 1, 1990, onward." Def.'s Br. filed July 21, 2003, at 11. Plaintiff's characterization, too, is apt in that *OIC* also involved a contractor that "continued to provide service to the government on the expiration of a predecessor contract— with the knowledge of the government and the expectation of the award of a formal follow-on contract." Pl.'s Br. filed Aug. 15, 2003, at 11.

The conduct of both parties underscores the similarity of *OIC*. The realities of the situation demonstrate that during the 20–month period plaintiff continued providing AUTODIN services to DOD and DECCO continued to pay plaintiff for those services. Plaintiff had agreed to provide AUTODIN service after December 1989, and DECCO had agreed to pay for it on a provisional basis until the parties could enter into a formal contract. Indeed, in a March 18, 1991 "DECCO Acquisition Plan Addendum" the contracting officer identified the January 1, 1990 date as the "Required Service Date" and stated that the purpose of the acquisition was to "to reestablish valid contractual coverage to provide a basis for receiving and paying for AUTODIN service."

5. *Rules of construction—No ambiguity in "Pricing of Adjustments" clause*

■ The parties agree that the Pricing of Adjustments clause controls which version of the cost principles governs the Letter Contract.

Plaintiff explains that the "in effect on the date of this contract" language is used because of the two different forms that the Government may use in awarding contracts: Standard Form ("SF") 26 and SF 33. SF 33 has no effective-date block, whereas SF 26, which was employed in the case at bar, has blocks for both an effective date and an execution date, which may and do differ, depending on the circumstances. The "date of this contract," as that term appears in the Pricing of Adjustments clause, thus accommodates attaching legal significance to the specified date(s), or to another date if the parties so condition the contract's legal effectiveness. The Pricing of Adjustments clause is generic to encompass various situations, but it is not thereby rendered ambiguous. "In effect on the date of the contract" for purposes of the Pricing of Adjustments clause refers to the date on which the contract becomes effective and binding.[9]

9. Plaintiff points out that "all mandatory FAR and DFARS clauses *'in effect on the date of execution'* were expressly incorporated through the Definitization clause. Thus, if the date of execution was the 'date of this contract,' as Defendant argues, there would be no need to expressly incorporate clauses in effect on the date of execution." Pl.'s Br. filed Aug. 15, 2003, at 5–6 n.10.

Arguing that "in effect on the date of this contract" is ambiguous, defendant looks to the provisions of the Letter Contract, the parties' actions, and procurement policy principles in order to construe the ambiguity in defendant's favor. *Honeywell, Inc. v. United States*, 228 Ct.Cl. 591, 596, 661 F.2d 182, 186 (1981), explained that "the court's duty is to effectuate the intent of the promulgators of the regulation or statute," even when such a regulation is incorporated into a contract. A "mutually exclusive rule of construction," *id.* applies to specific provisions that the parties incorporate into a contract. The parties' intent is meaningful in this context only. *Id.* Not only is no ambiguity present for the court to reconcile, but the factors urged by defendant are not relevant to the interpretation of a standard government contract clause.

Plaintiff reminds the court that defendant changed its position from first arguing that plaintiff's explicit agreement to be bound by the FAR clauses in effect on September 3, 1991, required the application of FAR § 31.205–52 (which is a regulation, not a clause) to later espouse that the DFARS "Pricing of Adjustments" clause was ambiguous.[10] Although defendant clarified at oral argument that it did not challenge the sufficiency of plaintiff's claims to the contracting officer, plaintiff's failure to argue that the cost principles of FAR § 31.205–52 did not apply, defendant posits, nonetheless is indicative of the parties' intent. DOD informed plaintiff that FAR § 31.205–52 was applicable and would prevent plaintiff from recovering costs associated with the stepped-up assets, and plaintiff never demurred. Moreover, even subsequent to execution of the Letter Contract, plaintiff did not present the position that FAR § 31.205–52 was inapplicable due to the Letter Contract's effective date. Defendant also charges that plaintiff's internal documents do not suggest any consideration of the effective date argument "at any relevant time." Tr. at 72.

Defendant's argument is peripheral to the merits. Once plaintiff made clear the basis and amount of its claim, plaintiff was not under duty to identify every potential legal argument earlier in the proceedings, nor was the Government precluded from changing its legal argument as to why plaintiff should be denied the costs sought. At this point in the proceedings, however, the parties have put forth all their legal arguments.

Even if intent were important, the court finds that defendant's characterization of the parties' intent strains the boundaries of vigorous advocacy. Defendant has plaintiff providing AUTODIN services to DCA–DECCO with only an "anticipation" that it would be paid for them, "but there was no understanding in early 1990 that those services would eventually be part of a written contract." Tr. at 94. The record shows that the Letter Contract was a follow-on contract. Plaintiff's predecessors had been providing the services for years, with no indication that this mutually beneficial arrangement would cease. Any sentient contractor in the same situation would obtain a written contract in order to guarantee appropriate payment for the services provided. *See Honeywell*, 228 Ct.Cl. at 592, 661 F.2d at 183. The fact that no such contract was reduced to writing until 20 months later does not indicate that plaintiff and DCA–DECCO never contemplated a written contract; rather, as demonstrated by plaintiff's time line and the parties' responses to proposed findings, from the outset of this period the parties were endeavoring to agree on a price. Any other significance attached to the delay in memorializing the parties' agreement in the Letter Contract is speculation, belied by a record replete with manifestations conveying that the assurance of uninterrupted services was a principal objective of the Letter Contract. The court finds that the delay did not involve the central object, which was to insure continuous coverage. Defendant's postulate that the services were provided without contemplation of a written contract is wholly unsubstantiated.

Defendant's argument that recognizing the January 1, 1990 effective date would be unfair to other contractors that entered into contracts on September 3, 1991, causes the court to pause. It is also correct that obso-

---

10. The court draws no conclusions regarding the meaning of the "date of this contract" on wholly executory contracts that have not been reduced to writing or verbal agreement.

lete cost standards cannot apply to contracts. However, both these arguments presume that the January 1, 1990 declared effective date of the Letter Contract was a retroactive act that smacks of arbitrariness. That characterization could not be more alien to the facts. The parties to the Letter Contract did not manipulate dates to plaintiff's advantage or to revive an obsolete cost standard. The effective date assigned to the contract did no more than reflect the actual date on which the parties agreed to be bound.

Because issues concerning the MOU must be resolved at trial, and RCFC 54(b) authorizes the court to modify its ruling on Count I if it is shown that the MOU somehow eclipses plaintiff's recovery of stepped-up depreciation costs on Count I, see RCFC 54(b), the court rules that defendant has not established that the MOU forecloses plaintiff's recovery.

## II. *Count IV*

### 1. *Summary judgment standards*

Summary judgment is appropriate only where "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c), *see also Telemac*, 247 F.3d at 1323. Summary judgment may not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *see also Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 971 (Fed.Cir.2001); *General Elec. Co. v. Nintendo Co.*, 179 F.3d 1350, 1353 (Fed.Cir.1999). If the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, the motion for summary judgment should be denied. "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106

S.Ct. 2505; *see also Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d 1253, 1257 (Fed. Cir.2001).

### 2. *The parties' positions*

Because the contracting officer definitized the Letter Contract with a price consistent with established standards, defendant defends the price as a reasonable one, such that defendant is entitled to summary judgment. Plaintiff argues that it must receive a "fair and reasonable" price for the services it performed independent of any regulations that may prohibit costs associated with stepped-up assets.

Count IV is based on the "Contract Definitization" clause, which provides that the contractor is entitled to a "reasonable price ... in accordance with Subpart 15.8 and Part 31 of the FAR, the 1976 DCA/Contel (Western Union) Memorandum of Understanding, and such applicable FCC Regulations, ...." FAR § 15.802(b), also incorporated by reference, mandates the "purchase [of] supplies and services from responsible sources at fair and reasonable prices." FAR § 31.102 similarly provides that the "objective will continue to be to negotiate prices that are fair and reasonable, cost and other factors considered." Plaintiff argues that the regulations at FAR Part 49 are relevant and quotes FAR § 49.201 (2002), which states that, in achieving "fair compensation," "[c]ost and accounting data may provide guides, but are not rigid measures, for ascertaining fair compensation." Thus, in plaintiff's view, a fair and reasonable price is mandated independently from any individual cost element, and the obligation to set a fair price takes precedence over any mechanical application of the FAR.[11]

Arguing that the price was fair and in accordance with the MOU and that all unallowable costs pursuant to FAR Part 31, defendant would apply Defense Procurement Circular No. 79 (May 15, 1970) ("DPC 79"), to prohibit unallowable costs from being re-

---

11. Plaintiff proffers three reasons for this position: (1) The substantive significance of FAR § 31.102 is that contractors should receive a fair and reasonable price, although they need not negotiate each element of contract cost; (2) the parties may negotiate a total price that effectively compensates the contractor for unallowable costs; and (3) FAR § 31.102 provides that "notwithstanding the mandatory use of cost principles, the objective will continue to be to negotiate prices that are fair and reasonable, cost and other factors considered."

covered under a fixed-price contract. The regulations at FAR Part 49 are inapplicable, defendant explains, because they address contracts terminated at the Government's convenience. This case deals with establishing a fair and reasonable price, "pursuant to FAR Subpart 15.8, FAR Part 31, the 1976 MOU, and the pricing of adjustments clause." Def.'s Br. filed July 21, 2003, at 40.

Plaintiff urges that the price for AUTO-DIN service in CY 1991–93, implemented by the contracting officer after the parties failed to agree, was not "fair and reasonable," as the contract required. Plaintiff points out that defendant's price analysts stated in 1993 that recovery of annual depreciation was reasonable. The $28.1 million price for CY 1990 was reduced to $19 million, $21 million, and $18 million in subsequent calendar years. Defendant accounts for these variations by the differences in plaintiff's price proposals and the differences in services provided. Plaintiff then indicates that the definitized price was lower than costs projected at a government meeting in March and much lower than the Not–To–Exceed prices previously agreed to by DOD. Defendant responds that these are maximum prices and the contracting officer may definitize at a lower rate. The Rates Analysis Division found it reasonable to allow plaintiff to recover all of its costs. Defendant suggests that this variance in price occurred because the "amounts the contractor proposed varied from year-to-year, and the contractor's costs decreased over time." Def.'s Br. filed July 21, 2003, at 42.

At bottom, plaintiff argues that the price is not fair and reasonable because it was insufficient to cover plaintiff's actual costs, including depreciation and other asset-related costs associated with the AUTODIN purchase. This price is "inadequate whether it is measured against Plaintiff's unavoidable costs, the price the government paid for AUTODIN service in prior years under identical circumstances, or the government's own estimates of the probable price and other factors." Pl.'s Br. filed May 30, 2003, at 29. FAR § 31.205–52 prohibits all such costs, defendant contends, and cannot be ignored in de-termining the appropriate recovery for plaintiff.

Defendant ultimately rests on the parties' understanding that the contractor was not "entitled to be paid depreciation upon fully-depreciated assets, but was entitled to a four percent 'management fee'" as indicated in the 1976 MOU. Def.'s Br. filed July 21, 2003, at 19. Plaintiff depicts a scenario whereby, in April 1992, the parties agreed the price would be definitized according to FAR and DFARS, as opposed to MOU and the FCC regulations, which were then abandoned. The MOU itself does not refer to stepped-up asset costs, but, rather, the MOU deals with depreciation. Therefore, the MOU does not prohibit recovery of depreciation based on stepped-up assets and allows such compensation to the extent the contractor has not fully recovered its investment.

Defendant responds that plaintiff's argument "ignore[s] the fact that the parties to the Letter Contract incorporated the 1976 MOU into that FAR-based contract for the purpose of pricing that contract." Def.'s Br. filed July 21, 2003, at 19. The fact that the Western Union assets had been capitalized in accordance with Cost Accounting Standards is not relevant to the MOU's applicability. The CAS address allocability, not allowability; and mere compliance with CAS does not entail recovery of stepped up assets. *See Kearfott Guidance & Navigation Corp. v. Rumsfeld,* 320 F.3d 1369, 1376–77 (Fed.Cir. 2003). The plain language of the contract, moreover, indicates that it was subject to the FAR and that the 1976 MOU was to be used for determining the contract price. This is defendant's proffered reason for incorporating the MOU.

Plaintiff points out, however, that the price set did not cover the contractor's unavoidable book costs, which put plaintiff in a loss position for several years, and complains that this price was neither "fair" nor "reasonable." Pl.'s Br. filed May 30, 2003, at 31. Defendant denies that any provision establishes that a contractor may recover all "unavoidable book costs." Def.'s Br. filed July 21, 2003, at 41. Cost principles disallow recovery of "some true costs of doing business." *Lockheed Aircraft Corp. v. United*

*States,* 179 Ct.Cl. 545, 555, 375 F.2d 786, 792 (1967).

### 3. *Disputed facts*

■ Plaintiff and defendant are at loggerheads even in regard to the factual basis for this claim. The contradictory correspondence from government personnel indicates that factual issues are present regarding the fairness of a price excluding the stepped-up assets. Plaintiff lists: 1) The discrepancy between the CY 1990 price of $28.1 million and subsequent prices for CY 1991–1993 of $19 million, $21 million, and $18 million, respectively; 2) a memorandum by Harry Perkins, Chief DMS Networks Engineering Division noting projected CY 1991–1993 costs between $26.9 million and $28.3 million; 3) DOD's agreement to pay plaintiff the NTE price of approximately $30 million at various times; and 4) the request of the contracting officer to develop a price including stepped-up asset depreciation.

Plaintiff cites the April 1, 1993 statement of a Defense Information Systems Agency price analyst stating that AUTODIN pricing was governed by the FAR and DFARS, and not FCC regulations. The price analyst continued, "[t]his basically means that a fair and reasonable price includes all allowable and allocable costs plus a fair and reasonable profit." Pl.'s Br. filed May 30, 2003, App. 35, at A0235. Furthermore, the analyst noted that the original accounting was performed pursuant to GAAP and stated that the contractor had the duty to recover the costs associated with that, *e.g.* annual depreciation.[12] The analyst also stated, "Determining these costs to be reasonable is, therefore, supported by FAR 31.201–3."[13] *Id.*

Defendant also relies on the parties' actions prior to the execution of the Letter Contract as relevant to the interpretation of a standard clause of the contract, citing a proposal of plaintiff's predecessor submitted in response to Solicitation No. DCA 200–90–R–0035, dated May 1, 1991. Plaintiff disputes any relevance of such actions; not only did plaintiff submit proposals both before and after the one cited by defendant, but all the proposals included the cost of the assets acquired from Western Union based on their stepped-up value to plaintiff.

Plaintiff also disputes the relevance of including the 4% "usage fee," in the definitized price. Pl.'s Resp. to Def.'s Proposed Findings of Fact No. 15, filed May 30, 2003. According to plaintiff, "Count IV is framed by the FAR requirement to provide the contractor with a fair and reasonable price, regardless of the allowability of individual cost elements, or the incorporation of a specific usage fee. The inclusion of a four percent usage fee does not address—one way or another—whether the price met this standard." *Id.*

The parties also dispute whether the references to the MOU and FCC regulations were added at the request of plaintiff's predecessor (defendant's position) or at the request of both parties (plaintiff's position). Plaintiff argues that, at the time of the execution of the Letter Contract, it had not been decided whether the AUTODIN services would be provided pursuant to the MOU and FCC regulations or pursuant to FAR requirements. As a result, this request did not reflect any belief of plaintiff that it was not entitled to recover stepped-up asset costs.

### 4. *Applicable case law*

Plaintiff suggests that case law discussing a "fair and reasonable price" would allow for recovery of the stepped-up assets, regardless of the applicability of FAR § 31.205–52. Defendant, however, states that a contractor knowingly may not include any unallowable costs in a fixed-price contract pursuant to the "fair and reasonable" approach. Defendant

---

12. Such evidence demonstrates the existence of factual issues because of disagreements within the Government regarding the treatment of the stepped-up asset costs; it does not indicate the ability of a price analyst to bind the Government.

13. Moreover, whether or not the analysts were attorneys, they were involved in the AUTODIN price negotiations and their opinions indicate the inconsistent views regarding the sufficiency of the definitized price. As plaintiff indicates, defendant's use of declarations by the same individuals who support its position, "simply underscores its failure to confront and answer the genuine issues of fact raised by Count IV." Pl.'s Br. filed Aug. 15, 2003, at 15.

also suggests that plaintiff is attempting inappropriately to argue that the rules of termination for convenience should apply.

The Contract Definitization clause incorporates FAR § 31.102, "Fixed-price contracts," which provides, in part, that "notwithstanding the mandatory use of the cost principles, the objective will continue to be to negotiate prices that are fair and reasonable, cost and other factors considered." Discussing converting depreciation costs into dollars, the Federal Circuit has noted that "FAR 31.102 ... requires that the negotiation of prices in fixed-price contracts must be 'fair and reasonable.'" *General Elec. Co. v. Delaney*, 251 F.3d 976, 979 (Fed.Cir.2001). In analyzing an equitable adjustment issue, the court has stated that parties "need not negotiate each element of cost;" rather, the goal is to "'negotiate prices that are fair and reasonable, cost and other factors considered.'" *North Am. Constr. Corp. v. United States*, 56 Fed. Cl. 73, 79 (2003). It should be noted, however, that equitable adjustments are made specifically to benefit the contractor and make it whole for changes ordered by the Government. *See id.* at 78–79.

Plaintiff views termination for convenience as analogous to the case at bar. The overriding purpose of FAR cost principles is to find a fair and reasonable price. Accordingly, achieving this goal requires an analysis distinct from which costs are allowable, as does a termination for convenience. According to plaintiff, "every unallowable that a company incurs is paid for by the government in the price. It's just called profit." Tr. at 91.

Defendant discounts those rules as very specialized and uniquely pro-contractor. FAR § 15.8 and not FAR Part 49 should control the pricing of this contract, according to defendant. In *Nicon, Inc. v. United States*, 331 F.3d 878, 885–87 (Fed.Cir.2003), the Federal Circuit describes the termination for convenience process as one in which the objective is to compensate the contractor fairly and make the contractor whole for work performed. No authority guarantees a contractor its unavoidable book costs. Defendant looks to *Lockheed Aircraft*, 179 Ct. Cl. at 555, 375 F.2d at 792, in which the court

noted that cost principles prohibit recovery of "some true costs of doing business."

Defendant's motion for partial summary judgment as to Court IV obviously is premature.

### CONCLUSION

Accordingly, based on the forgoing,

**IT IS ORDERED**, as follows:

1. Plaintiff's motion for partial summary judgment on Count I is granted, and the Clerk of the Court shall enter judgment for plaintiff on Count I when the court directs entry of final judgment.

2. Defendant's cross-motions for partial summary judgment on Counts I and IV are both denied.

3. A scheduling order has been entered separately.